UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JENNIFER SMITH,

                   Plaintiff,

              v.

BANK OF AMERICA CORP., and BANK OF
AMERICA, N.A.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

            :   **ECF CASE**

            :   Case No: 11 CV 6368-JBW-JO

## COMPENDIUM OF UNREPORTED DECISIONS

Attached hereto are copies of the following unreported decisions that are referred to in Defendants Bank of America Corp. and Bank of America, N.A.'s Memorandum of Law In Support of Their Motion To Dismiss And/Or Strike Portions Of Plaintiff's Complaint:

1) <u>Allah v. City of New York.</u>, 47 Fed. Appx. 45  (2d Circ. 2002)

2) <u>Bostick v. St. Jude Medical, Inc.</u>, 2004 U.S. Dist. LEXIS 29997 (W.D.Tn. Aug. 17, 2004)

3) <u>Colabella v. AICPA</u>, 2011 U.S. Dist. LEXIS 110982 (E.D.N.Y. Sept. 28, 2011)

4) <u>De La Cruz v. Gill Corn Farms, Inc.</u>, 2005 U.S. Dist. LEXIS 44675 (N.D.N.Y. Jan. 25, 2005)

5) <u>Deleon v. Time Warner Cable LLC</u>, 2009 U.S. Dist. LEXIS 74345 (C.D.Ca. July 17, 2009)

6) <u>Sells-Lawrence v. Chase Manhattan Bank, N.A.</u>, 2002 U.S. Dist. LEXIS 4346 (D.C.V.I. Mar. 12, 2002)

7) <u>The Mazza Consulting Group, Inc. v. Canam Steel Corp.</u>, 2008 U.S. Dist. LEXIS 32670 (E.D.N.Y. Apr. 21, 2008)

Dated: New York, New York
February 17, 2012

McGUIREWOODS LLP

By:  ___/s/ Philip A. Goldstein_____
        Philip A. Goldstein

\37259446.1

LEXSEE



Positive
As of: Feb 17, 2012

**SHATIEK ALLAH, Plaintiff-Appellant, -v- CITY OF NEW YORK DEPARTMENT OF PARKS & RECREATION, Defendant-Appellee.**

**(01-9114)**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**47 Fed. Appx. 45; 2002 U.S. App. LEXIS 20475**

**September 25, 2002, Decided**

**NOTICE:**    [**1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**   Writ of certiorari denied: Allah v. Ny Dep't of Parks & Recreat., 2003 U.S. LEXIS 1761 (U.S. Mar. 3, 2003).

**PRIOR HISTORY:**    Appeal from the United States District Court for the Southern District of New York (Marrero, J.).
 Allah v. City of N.Y. Dep't of Parks & Rec., 162 F. Supp. 2d 270, 2001 U.S. Dist. LEXIS 14754 (S.D.N.Y. 2001).

**DISPOSITION:**   Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee, an African-American who adhered to the Five Percenter religion, appealed from an order of the United States District Court for the Southern District of New York dismissing on summary judgment his complaint alleging race and religious discrimination under 42 U.S.C.S. § 1981 and the state's human rights law and retaliation under Title VII against defendant employer, a city parks department.

**OVERVIEW:** Because the employee could not establish either a continuing violation or hostile environment ex-

ception to the 300-day period for filing his EEOC charge, he had no Title VII claim for conduct occurring earlier. That made only his termination and transfer to a dangerous assignment claims actionable under Title VII; however, both § 1981 and the human rights law had three-year limitations, and thus, the court addressed all his discrimination claims. The court assumed that the employee established a prima facie case of race discrimination; however, the employee offered insufficient evidence to allow a reasonable fact finder to conclude that the employer's proffered reasons were pretextual and its real motive discrimination. Assuming that the employee's many complaints were protected activity, there was insufficient evidence for a reasonable trier of fact to conclude that retaliation for protected activity motivated either his transfer or termination. The record depicted an employee who was seen, inter alia, as having: failed a urinalysis, had excessive absences, disrupted a meeting, disobeyed a supervisor's direct order, and engaged in an altercation with another supervisor.

**OUTCOME:** The court affirmed the judgment of the district court.

**CORE TERMS:** supervisor, termination, discriminatory, discrimination claims, protected activities, continuing violation, retaliation, hostile, prima facie case, actionable, vacation, playground, excessive, pretext, arrest, urine tests, religion, employment discrimination, religious discrimination, internal quotation marks omitted, statute of limitations, giving rise, reasonable jury, causal connection, insufficient evidence, disciplinary, retaliated, urinalysis, convicted, occurring

**LexisNexis(R) Headnotes**

*Governments > Legislation > Statutes of Limitations > Extension & Revival*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*
[HN1]Discrete discriminatory acts are not actionable if time barred, even where they are related to acts alleged in timely filed charges.

*Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > General Overview*
[HN2]An actionable hostile environment claim must target conduct like racial taunting, stereotyping, and intimidation that does not impact an employee's pay or benefits but nevertheless is so persistent and severe that it alters the conditions of the victim's employment and creates an abusive working environment.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
[HN3]The Second Circuit analyzes 42 U.S.C.S. § 1981 and Human Rights Law discrimination claims using the same analytic framework that it uses for Title VII discrimination claims. A plaintiff must initially offer proof that, among other things, the actions taken against him occurred in circumstances giving rise to an inference of discrimination. The plaintiff must then articulate nondiscriminatory reasons for the actions it has taken. If the plaintiff does so, the plaintiff bears the ultimate burden of proving that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. A prima facie case plus a showing of pretext may defeat a properly supported summary judgment but will not always do so. Instead, the court must determine whether the plaintiff's proof could convince a reasonable fact-finder that discrimination motivated his employer. In making this determination, the court should consider the strength of the prima facie case, the proof that defendants' explanation was false, and any other probative proof in the record.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN4]A plaintiff can make out a prima facie case of retaliation under Title VII by showing (1) that he was engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that he suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action.

**COUNSEL:** Appearing for Appellant: Alan E. Wolin, Wolin & Wolin, Jericho, NY.

Appearing for Appellee: John Hogrogian, Assistant Corporation Counsel of the City of New York, New York, NY.

**JUDGES:** Present: Pierre N. Leval, Guido Calabresi, Rosemary S. Pooler, Circuit Judges.

**OPINION**

[*46] **SUMMARY ORDER**

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the order of said District Court be and it hereby is **AFFIRMED**.

Plaintiff Shatiek Allah appeals from an order of the United States District Court for the Southern District of New York (Victor Marrero, *District Judge*) that dismissed, pursuant to Federal Rule of Civil Procedure 56, Allah's employment discrimination complaint against his former employer the New York City Department of Parks and Recreation ("Parks").

Allah, who is African-American and adheres to the Five Percenter religion, worked for Parks from May 1985 until his termination [**2] on December 10, 1999.

[*47] On March 12, 1999, Allah filed a civil rights complaint against Parks in which he made claims of racial and religious discrimination pursuant to 42 U.S.C. § 1981 and the New York Human Rights Law. The actions of which Allah complained began on October 30, 1996, when a representative of Parks threatened him with arrest while questioning him concerning the arrest of another Parks employee. Allah also complained of other incidents including (1) a 1997 disciplinary proceeding in which Allah was convicted of several charges including use of cocaine, excessive absences, and failure to

promptly notify Parks of an arrest; and was disciplined by loss of pay and vacation days; (2) repeated instances in which Parks docked Allah's pay for absences; (3) a change in schedule that prevented Allah from taking care of personal business without taking a vacation or personal day; (4) denial of permits for activities Allah wished to conduct in the parks; (5) a change for the worse in Allah's 1996 performance evaluation after Allah signed it; and (6) Parks' failure to adequately investigate Allah's complaints.

On December 10, 1999, Parks fired Allah based [**3] on its findings that he struck and intimidated a supervisor, used obscene language with that supervisor, failed to obey the lawful order of another supervisor, engaged in disruptive conduct, was late on excessive occasions, and neglected assigned duties. Allah filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") on May 4, 2000. He claimed that Parks discriminated against him based on race and religion and retaliated against him for protected activities including his filing of the federal court complaint and a myriad of internal complaints. In addition to alleging that his termination was discriminatory and retaliatory, Allah complained of all the conduct set out in his federal court complaint. He also added new incidents of allegedly discriminatory and retaliatory conduct: (1) in March 1999, he was counseled in a supervisory conference despite the fact that the supervisor who counseled him had not observed the conduct at issue and (2) Parks twice assigned him to the Elijah Stroud playground despite supervisors' knowledge that the playground would be dangerous for Allah and, on one occasion, that it lacked heat and hot water.

On August 28, 2000, EEOC [**4] dismissed Allah's complaint and notified him of his right to sue. Allah then filed an amended complaint adding his new factual allegations and making a Title VII claim.

The district court granted Parks' motion for summary judgment. Judge Marrero first found that all of Allah's Title VII claims except those occurring after June 24, 1999, were barred by the statute of limitations for filing a complaint with the EEOC. See *Allah v. City of New York Dep't of Parks & Recreation, 162 F. Supp. 2d 270, 273 (S.D.N.Y. 2001)*. As to any remaining discrimination claims, the court found that Allah failed to establish both that he had suffered an adverse employment action and that the employment action in question occurred under circumstances giving rise to an inference of discrimination. *Id.* The court also dismissed Allah's *Section 1981* discrimination claims because of Allah's failure to offer proof from which a reasonable jury could find an adverse employment action or could infer discrimination. *Id.* at 274. Finally, Judge Marrero dismissed the retaliation claim, finding that Allah did not offer suf-

ficient evidence of a causal connection between his protected [**5] activity and subsequent employment actions. *Id.* at 274.

Allah appeals, arguing principally that the court erred by (1) failing to give him the benefit of the continuing violation or hostile environment exceptions to the 300 [*48] day limitation period for filing discrimination claims with the EEOC, (2) finding no adverse employment action or circumstances permitting an inference of discrimination, and (3) rejecting his retaliation claim. Parks both defends the district court's reasoning and contends that because Allah filed no complaint with the New York State Division of Human Rights ("DHR"), he had only 180 days to file his complaint with the EEOC.

For our purposes, we assume that Allah had a full 300 days in which to file his EEOC complaint. Therefore, unless Allah can establish a continuing violation or hostile environment exception to the 300-day statute of limitations, he has no Title VII claim for conduct occurring before late June 1999, making only his termination claim and his claim that Parks discriminated against him by transferring him to a dangerous playground in July 1999 actionable under Title VII. He can establish neither.

Assuming that this circuit's [**6] test for a continuing violation exception remains valid, [1] Allah failed to make the required showing of either "discrete incidents of discrimination [that] are specifically related and are allowed to continue unremedied for so long as to amount to a discriminatory policy or practice" or of an actual discriminatory practice such as the use of a discriminatory employment test. *Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997)* (internal quotation marks omitted). Because Allah alleges many different types of actions that were committed by different supervisors and that bear no clear relationship to each other or to the only acts within the 300-day period, he does not allege a continuing violation.

> [1]  A recent Supreme Court's decision casts some doubt on the continued existence of a continuing violation exception if the continuing violation does not create a hostile environment. *See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 153 L. Ed. 2d 106, 122 S. Ct. 2061, 2072 (2002)* (holding [HN1]that "discrete discriminatory acts are not actionable if time barred, even where they are related to acts alleged in timely filed charges").

[**7]  Nor do Allah's allegations describe a hostile environment. Allah complains both of acts that had a tangible effect on his employment, e.g. transfers to unattractive environments, termination, loss of pay, loss of vacation, changes in an evaluation, and of acts that on

their face have nothing to do with his employment, e.g. denials of permits to hold outside events. [HN2]An actionable hostile environment claim, on the other hand, must target conduct like racial taunting, stereotyping, and intimidation that does not impact an employee's pay or benefits but nevertheless is so persistent and severe that it alters "the conditions of the victim's employment and creates an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). Allah does not describe a hostile environment. Consequently only his termination and July transfer claims are actionable under Title VII.

However, Allah's Section 1981 and Human Rights Law claims both have three-year statutes of limitations. *See Mian v. Donaldson, Lufkin & Jenrette Secs.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (Section 1981); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 [**8] (Human Rights Law). Therefore, we must address the merits of all of Allah's discrimination claims.

[HN3]This circuit analyzes Section 1981 and Human Rights Law discrimination claims using the same analytic framework that it uses for Title VII discrimination claims. *See Whidbee v. Garzarelli Food Specialties*, 223 F.3d 62, 69 (2d Cir. 2000) (Section [**49] 1981); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 n.4 (2d Cir. 1995). Allah must initially offer proof that, among other things, the actions taken against him "occurred in circumstances giving rise to an inference of discrimination." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Parks must then articulate non-discriminatory reasons for the actions it has taken. If Parks does so, plaintiff bears the "ultimate burden" of proving "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 143, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)). Plaintiff's prima facie [**9] case plus a showing of pretext may defeat a properly supported summary judgment but will not always do so. *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir. 2001). Instead, the court must determine whether plaintiff's proof could convince a reasonable fact-finder that discrimination motivated his employer. *Id.* In making this determination, the court should consider the strength of the prima facie case, the proof that defendants' explanation was false, and any other probative proof in the record.

For purposes of this discussion, we assume that plaintiff established a prima facie case of race discrimination, albeit a very weak one. [2] The only evidence plaintiff offered relevant to discriminatory intent was (1) there were no African American supervisors at Parks; (2) none of the individuals who acted against Allah were African

American or Five Percenters; and (3) two other individuals whose urine tests showed narcotics use and who were neither African American nor Five Percenters were given temporary promotions for summer supervisory positions but Allah, whose urine test was positive for cocaine, was not. Allah offered no information concerning the relative qualifications [**10] of these employees, their seniority, the type of drug they took, or whether they, like Allah, were convicted of offenses in addition to the narcotics charge. In fact, the two, unlike Allah, stipulated to their guilt, an opportunity Allah also was offered but declined. Parks, on the other hand, offered significant evidence and not just plausible articulations for most of the actions it took against Allah. For instance, to justify Allah's termination, Parks offered testimony from three supervisors describing Allah's verbally and physically abusive conduct toward one of them. Allah offers almost no evidence of pretext. For instance, he does not dispute that he used obscene language with his supervisor, that the urine test underlying the 1997 disciplinary action was positive, or that he did not obey another supervisor's order to clean the perimeter of a park. We conclude that Allah has offered insufficient evidence to allow a reasonable fact finder to conclude that Parks' preferred reasons were pretextual and its real motive discrimination. Thus, we affirm the district court's dismissal of Allah's discrimination claims.

   2   We agree with the district court that certain of the acts of which Allah complained, e.g. denial of permits to use a park for outside activities, were not adverse employment actions. However, certain acts, e.g. Allah's termination, his loss of vacation and pay, and the 1997 discipline, clearly were adverse employment actions. We also assume that Allah's July 1999 transfer to a dangerous and uncomfortable playground was an adverse employment action.

   Allah did not offer even a prima facie case of employment discrimination based on religion because he described no circumstances from which a reasonable fact finder could infer religious discrimination.

[**11]  Plaintiff claimed retaliation only pursuant to Title VII. Therefore, we consider [*50] only his termination and transfer in determining whether plaintiff provided sufficient proof from which a reasonable jury could determine Parks retaliated against him. [HN4]Allah can make out a prima facie case of retaliation under Title VII by showing "(1) that [he] was engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that [he] suffered adverse employment action; and (4) that there was a causal connection

47 Fed. Appx. 45, *; 2002 U.S. App. LEXIS 20475, **

between the protected activity and the adverse action." *Holtz v. Rockefeller & Co., 258 F.3d 62, 79 (2d Cir. 2001)* (internal quotation marks omitted). Assuming that Allah established that some of his many complaints were protected activity, there is insufficient evidence for a reasonable trier of fact to conclude that retaliation for protected activity motivated Allah's transfer or his termination. The record depicts an employee who was per-

ceived by Parks as having (1) failed a urinalysis, (2) refused to stipulate to the results of that urinalysis, (3) refused to cooperate in an investigation of a [**12] fellow employee, (4) had excessive absences, (5) disrupted a meeting, (6) disobeyed a supervisor's direct order, and (7) engaged in a physical and verbal altercation with another supervisor. Therefore, the district court did not err by dismissing Allah's retaliation claims.

LEXSEE



Caution
As of: Feb 17, 2012

**JAMES BOSTICK and BOBBY H. THRASHER, Plaintiffs, vs. ST. JUDE MEDI-
CAL, INC., and ST. JUDE MEDICAL S.C., INC., Defendants.**

No. 03-2636 BV

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
TENNESSEE, WESTERN DIVISION**

**2004 U.S. Dist. LEXIS 29997**

**August 17, 2004, Decided
August 17, 2004, Filed**

**CORE TERMS:** connector, aortic, medical monitoring, class members, class certification, patient, class action, certification, bypass, state law, bypass surgery, nationwide, typicality, graft, Defs Mem of Law, implanted, occlusion, cardiac, personal injury, site, choice of law, increased risk, complications, implantation, presently, class representative, risk of harm, individual issues, asymptomatic, experienced

**COUNSEL:** [*1] For James Bostick, Bobby H. Thrasher, Plaintiffs: Carroll C. Johnson, III, LAW OFFICES OF CARROLL C. JOHNSON, Memphis, TN; Paul Berry Cooper, III, DEAL, COOPER, & HOLTON, PLLC, Memphis, TN.

For St. Jude Medical, Inc., St. Jude Medical S.C., Inc., Defendants: DeWitt M. Shy, Jr., J. Brook Lathram, Melissa A. Maravich, BURCH PORTER & JOHNSON, Memphis, TN; James C. Martin, REED SMITH, LLP, Oakland, CA; Steven M. Kohn, REED SMITH CROSBY HEAFY LLP, Oakland, CA.

**JUDGES:** DIANE K. VESCOVO, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** DIANE K. VESCOVO

**OPINION**

REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This action involves a product liability claim against defendants St. Jude Medical, Inc., and St. Jude Medical S.C., Inc. (collectively "St. Jude"). Before the court is the March 31, 2004 motion of the plaintiffs, James Bostick and Bobby Thrasher, seeking a determination, pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure, that this action may be maintained as a class action on behalf of the following class:

> All persons in the United States and its territories who have had a coronary artery bypass graft procedure [*2] utilizing the St. Jude Medical Symmetry Bypass System Aortic Connector Device, designed, manufactured and marketed by Defendant, St. Jude Medical, Inc. and/or St. Jude Medical S.C., Inc.

Or, in the alternative:

> All persons who have had a coronary artery bypass graft procedure utilizing the St. Jude Symmetry Bypass System Aortic Connector Device, designed, manufactured and marketed by Defendant, St. Jude Medical, Inc. and/or St. Jude Medical S.C., in the state of Tennessee.

The plaintiffs also seek an order confirming that James Bostick and Bobby Thrasher may serve as the represen-

tative plaintiffs and may be represented by the law firm of Deal, Cooper & Holton, PLLC, 296 Washington Avenue, Memphis, TN 38103. The motion was referred to the United States Magistrate Judge for report and recommendation. The magistrate judge held oral argument on August 3, 2004. Present at the hearing were Carroll Johnson for plaintiffs and DeWitt Shy and James Martin for St. Jude. Based on the briefs submitted by the parties, argument of counsel, and the record as a whole, it is recommended that the plaintiffs' motion for class certification be denied.

## I. PROPOSED FINDINGS OF FACT

[*3] St. Jude Medical is a cardiac device manufacturer based in St. Paul, Minnesota. (Defs.' Mem. of Law in Opp'n to Class Certification at 4.) St. Jude manufactures pacemakers, prosthetic heart valves, and cardiac repair devices. One of their cardiac products is the St. Jude Medical Symmetry Aortic Connector ("aortic connector"). (Id. at 5.) St. Jude began developing, designing, manufacturing, marketing, and selling the aortic connector in 2001. (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 1.)

The aortic connector is a small, star-shaped mechanical anastomosis device made of Nitinol that was designed for use by cardiac surgeons during surgery. (Id.) Coronary artery bypass graft surgery ("CABG") is designed to improve blood flow through coronary arteries to the heart muscle. (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Class Certification at 2.) During bypass surgery, the surgeon removes a portion of a blood vessel from the patient's leg, arm, or chest and uses the vessel as a conduit to bypass or detour an obstructed coronary artery. (Id. at 3.) Most often, surgeons use the saphenous vein from the leg as the bypass vessel. (Id.) The aortic connector [*4] is used to attach the saphenous vein graft to the aortic surface without sutures or the need for cross clamping or side biting of the aorta during CABG. (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 1.)

Prior to the aortic connector's placement on the market, St. Jude submitted to the Food and Drug Administration ("FDA") a "pre-market notification" for the aortic connector claiming the device was a "substantially equivalent device" as contemplated in the Medical Device Amendment at 21 U.S.C. § 301 et seq. [1] The aortic connector received § 510 (k) approval by the FDA on May 21, 2001. (Id. at 7.)

1 Pursuant to the Medical Device Act of 1976, amended in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-95, a medical device covered under the statute may be marketed pursuant to a pre-market approval, or pursuant to a

section 501(k) finding of "substantial equivalence." 21 U.S.C.A. § 360c(i).

The plaintiffs allege [*5] that St. Jude received adverse event reports from the medical community regarding complications associated with the aortic connector as early as August 2001. (Id.) The adverse reports describe a significantly higher incidence of complications in the form of restenosis and occlusion at the connector sites resulting in the need for re-operation using traditional hand-sewn techniques or other devices. (Id. at 2.) The first reported death associated with the aortic connector was on August 14, 2001. (Id.) The plaintiffs assert that since that date, multiple deaths associated with the aortic connector have been reported on the FDA's adverse events database. (Id.)

In addition to adverse reports, the plaintiffs also assert that a study conducted by Dr. G. Phillip Schoettle, a thoracic and cardiovascular surgeon in Memphis, on patients who had undergone bypass surgery using the aortic connector "revealed an 80 percent rate of occlusion or stenosis, uniformly occurring at the connector site" on patients having a repeat cardiac catheterization after the bypass surgery. (Id. at 8; id., Ex. 1.) Dr. Schoettle's research indicated that in traditional bypass surgery using [*6] hand-sewn grafts, there were roughly the same number of repeat cardiac catheterizations performed but with only a 15 to 20 percent rate of occlusion and stenosis. (Id.)

The plaintiffs also rely on minutes obtained from a FDA Circulatory System Devices Advisory panel meeting during which Ulwe Klima, a professor of cardiac surgery at Hanover Medical School for Cardiac Surgery, stated that follow-up angiography six months after bypass surgery on ten patients revealed six patients with occlusions and one with highly significant stenosis. (Id. at 9.) Klima further stated "angiographic follow-up at six months after surgery 'was sufficient to detect a real, real problem at the site of the anastomosis, even though these patients were asymptomatic. This is a very clear message as I say that even though you have an asymptomatic patient, you might have a significant problem at the site of the anastomosis.'" (Id.)

In addition to the independent studies presented to the court, the plaintiffs also submitted the affidavit of Dr. H. Frank Martin, Jr., a cardiologist who is board certified in cardiovascular disease and internal medicine. [2] Dr. Martin is not a cardiac surgeon, but asserts [*7] that he is familiar with techniques used during CABG and performs follow up care to CABG patients. (Martin Supp. Aff. at 1.) Dr. Martin opines, based upon his own personal knowledge and a review of Thrasher's and Bostick's medical records, that the implantation of St. Jude's aortic connector results in a "significantly increased risk

of developing re-stenosis or occlusion of the bypass graft . . . as opposed to traditional bypass surgery using sutures." (Martin Aff. at 2.) Dr. Martin states in his opinion that the "re-stenosis and occlusion associated with use of this device is uniformly located at the connector site and is causally related to use of the connector." (Id.)

    2   St. Jude has filed motions to strike both Dr. Martin's initial affidavit and his supplemental affidavit. At the time of the hearing, the plaintiffs had not responded to St. Jude's motion to strike Dr. Martin's supplemental affidavit and the time for response had not lapsed. Therefore, for the purposes of this report, the court will assume Dr. Martin's affidavit is admissible without deciding it is so, and the motions to strike will be addressed by separate order.

[*8] Dr. Martin indicates that the increased risk associated with the aortic connector can be attributed to the material from which the device is made and the procedure in which the bypass graft must be installed. (Id.) He suggests that all persons who have undergone a bypass surgery in which the aortic connector was used are in "need of immediate testing and medical monitoring to determine the extent of any compromise of the bypass graft because of the significantly increased risk of developing re-stenosis or occlusion associated with this device." (Id.) According to Dr. Martin, a cardiac catheterization is the "preferred procedure to determine the extent of bypass graft compromise." (Id.)

The plaintiffs contend that St. Jude's device has led to "severe and disabling medical conditions resulting from collapse and scarring of the graft as a result of the implanted aortic connector." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 2.) The plaintiffs assert that it is undisputed that over 40,000 [3] aortic connectors have been implanted in persons worldwide, including at least 300 implantations in Tennessee. (Id. at 3, 18.) They contend that those patients [*9] receiving the implanted device "suffer a significantly increased risk of developing severe and life threatening compromise of the aortic/venous bypass graft" and is at "risk of occlusion and/or stenosis." (Id. at 10.) The plaintiffs assert that the condition has "necessitated removal of the aortic connector in numerous patients, and severe harm to others who must now be monitored for further signs and symptoms of potentially fatal arterial bypass graft compromise." (Id. at 2.)

    3   In the class action complaint, the plaintiffs aver that over 50,000 aortic connectors have been implanted in persons worldwide. (Compl. at 6.) The discrepancy between 40,000 and 50,000 has

little impact on the court's analysis of Rule 23(a)'s numerosity requirement.

The amended complaint alleges negligence, strict product liability failure to warn, strict product liability, negligence, breach of implied and express warranties, and unjust enrichment. On March 31, 2004, the plaintiffs filed a motion for class certification with [*10] this court. The plaintiffs assert that their nationwide class, or in the alternative, Tennessee class is comprised of two sub-classes:

    Class I consists of all people in the United States and its territories who have had a coronary artery bypass graft procedure utilizing the St. Jude Medical Symmetry Bypass System Aortic Connector Device, or in the alternative all such people who received the device in the State of Tennessee, except those whose injuries have resulted in their death or serious injury resulting in the removal of the device.

    . . .

    Class II consists of all people in the U.S. or the State of Tennessee who received the aortic connector, or in the alternative all such people who received the device in the State of Tennessee, and who have sustained presently compensable physical injuries due to the aortic connector, including, without limitation, injuries requiring the removal of the aortic connector and injuries resulting in serious damages and/or death.

(Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 4-5.) As a remedy for Class I ("medical monitoring class"), the plaintiffs seek access to a "coordinated program of medical monitoring services" [*11] to include diagnostic testing and preventative screening care along with an approved epidemiological study and review of the results of the monitoring. (Id. at 4.) The plaintiffs suggest that medical monitoring could take place in the form of a cardiac catheterization, MRI, CT scan, stress test, and/or echocardiogram. They contend that the court should create and control a trust fund to provide for necessary medical monitoring and research. [4] (Id.) For Class II ("personal injury class"), the plaintiffs seek damages for personal injury, and if applicable, wrongful death and survival damages. (Id. at 5.)

    4   The plaintiffs assert that a medical monitoring program must include:

locating and notifying the class members of the defects and the potential medical harm; the creation of a registry and a baseline database of Class members; the funding for periodic monitoring and assessment of the Class members; the researching, gathering and forwarding of epidemiological and treatment/diagnostic modality information to Class members' treating physicians and other health care providers; the researching and assessment of the injuries or complications which are or may result from the subject products' defects, including the recognition and assessment of risks of explant versus no-explant alternatives; providing medical treatment to remove the aortic connectors in those individuals who exhibit bypass graft compromise as a result of implantation of the device; the research and development and implementation of appropriate psychological and emotion support and treatment programs for Class members and their spouses.

(Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 11.)

[*12]   Plaintiff James Bostick is a seventy-seven year old resident of Shelby County, Tennessee who seeks to represent Class I and II. Bostick underwent triple bypass surgery performed by Dr. Phillip Schoettle on August 27, 2002 in which the St. Jude aortic connectors were implanted. (*Id.* at 12; Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Certification at 8.) In November 2002, Bostick experienced a sudden onset of intense chest pain. (Opp'n at 8.) He subsequently underwent a heart catheterization, stress tests, and an angioplasty performed on November 15, 2002. (*Id.* at 9.) Bostick contends that he has experienced medical problems due to his initial bypass surgery and describes feeling tension, a nagging pain in his chest and a general lack of comfort in doing many of the things he previously did. (Pls.' at 12; Opp'n at 9.)) Nevertheless, Bostick has not had the aortic connectors removed and is purported to represent the class of presently asymptomatic bypass patients. Bostick seeks compensatory and other damages for medical ex-

penses and pain and suffering. He does not, however, seek lost wages or loss of consortium damages.

Plaintiff Bobby Thrasher is a sixty-one year old [*13]  resident of Alcorn County, Mississippi who seeks to represent Class II. Thrasher underwent bypass surgery performed by Dr. Schoettle on May 2, 2002 during which an aortic connector was implanted. Thrasher alleges that he began experiencing problems in October, 2002. (*Id.*) He continued to experience burning and pressure in his chest into November and December of 2002. (*Id.* at 13.) A cardiac catheterization revealed blockage, and on January 16, 2003, Thrasher underwent another bypass surgery to remove the aortic connector as a result of occlusion at the connector sites. (*Id.* at 13, 29.) Thrasher seeks compensatory and other damages for medical expenses, pain and suffering, wage loss, reduced earning capacity and loss of consortium type injuries.

At the August 3, 2004 evidentiary hearing, plaintiffs' counsel presented his argument for class certification first. During his opening remarks, counsel acknowledged that the variations in state law for the claims asserted in the complaint would make the certification of a nationwide class difficult but indicated nevertheless that plaintiffs were not abandoning that request. He then proceeded to address the certification of a Tennessee [*14]  class almost exclusively and presented no information on how a nationwide class action for either Class I or Class II could be maintained. Furthermore, plaintiffs' counsel failed to outline how variations in state law could be managed on a nationwide basis and did not address choice-of-law considerations.

II. PROPOSED CONCLUSIONS OF LAW

The defendants argue that courts in every circuit and the Supreme Court have denied certification of personal injury, product liability actions like this one because the requirements of <u>Rule 23</u> could not be met. Essentially, the defendant's primary argument against certification is that there are too many individualized legal and factual circumstances in this case, which would make class treatment futile.

A. Framework of <u>Federal Rule of Civil Procedure 23</u>

Within the framework of <u>Federal Rule of Civil Procedure 23</u>, the district court has broad discretion in determining whether an action should be certified as a class action. *Craft v. Vanderbilt Univ.,* <u>174 F.R.D. 396, 401 (M.D. Tenn. 1996)</u> (citing *Sterling v. Velsicol Chemical Corp.,* <u>855 F.2d 1188, 1197 (6th Cir. 1988)</u>). [*15]  That being said, district courts are required to conduct a "rigorous analysis" into whether the federal rule's prerequisites for a class action are met before certifying a class, "*especially*" in products liability cases involving drug or medical products that require FDA approval. *In re*

*American Medical Sys.*, 75 F.3d 1069, 1078-79, 1089 (6th Cir. 1996) (emphasis in original).

Rule 23 provides a two-part test for class certification and the burden of proof is on the plaintiff to establish that the lawsuit is maintainable as a class action. *Id.* at 1079. First, a plaintiff seeking class certification must meet the threshold requirements of Rule 23(a) of the Federal Rules of Civil Procedure. The plaintiff must show that

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a) [*16] . After establishing those requirements, the plaintiff must satisfy one of the three subsections of Rule 23 (b) that determine whether a class action is maintainable.

1. Rule 23(a)

a. Impracticable Joinder of All Members

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The impracticability of joinder for class action purposes is not determined by employing a strict numerical test. *In re American Medical Sys.* 75 F.3d at 1079. "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *Id.* (citations omitted).

Here, the plaintiffs contend that the class members are so numerous and geographically diverse that joinder of all members is impracticable. St. Jude does not dispute that both proposed classes meet the numerosity requirement of Rule 23 (a)(1). Accordingly, the requirement for numerosity as to both classes is satisfied by the fact over 40,000 aortic connectors have been implanted worldwide and approximately 300 in Tennessee.

b. Questions of Law and [*17] Fact Common to the Class

This requirement is ordinarily referred to as the commonality test. The commonality test "is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re American Medical Sys.*, 75 F.3d at 1080 (quoting Newberg & Alba Conte, *Newberg on Class Actions*, § 3.10, at 3-50 (3d ed. 1992)). Nevertheless, "the prerequisites of commonality and typicality will normally be hard to satisfy" in a products liability case. *In re Temple*, 851 F.2d 1269, 1273 n.7 (11th Cir. 1988) (cited in *In re American Medical Sys.* 75 F.3d at 1089).

The plaintiffs contend that in this case, all class members seek to resolve the legal issue of whether a product was defective and caused plaintiffs harm. [5] In turn, St. Jude argues that there are no common legal issues and no common factual issues from which the commonality requirement can be satisfied. As for common legal questions, St. Jude contends that the court must undertake a choice-of-law analysis to determine which state law applies to the claims of each class member. With state law differences on issues such as strict [*18] product, negligence, and medical monitoring, St. Jude asserts that there will not be any legal issues common to the class as a whole.

5   The plaintiffs assert that the questions of law and fact common to Class I and II include:

> (a) whether the subject aortic connector designed, developed, manufactured, distributed, fabricated, supplied, advertised, promoted and/or sold by St. Jude has a defect or defects;
>
> (b) the nature of said defect(s);
>
> (c) whether the aortic connector causes an increased risk of occlusion at the connector sites;
>
> (d) whether St. Jude conducted testing on the aortic connectors to the extent reasonably necessary to determine its safety prior to selling and/or distributing it;
>
> (e) whether said testing was adequate and responsible;
>
> (f) whether St. Jude accurately reported its test results;
>
> (g) whether St. Jude failed to disclose to the FDA information known to it and relevant to the aortic connector's safety and efficacy;
>
> (h) whether the warnings, if any, given by St. Jude were reasonable in light of what it knew or should have known;

(i) whether St. Jude's failure to give adequate and timely warnings of the dangers of the aortic connector constitutes negligence per se;

(j) whether consumers who were implanted with the aortic connector are at an increased risk of developing serious adverse health effects including respiratory failure, heart attacks, and death;

(k) whether monitoring and testing procedures which make early detection and treatment of the serious adverse health effects caused by occlusion at the connector sites are possible and beneficial;

(l) whether medical monitoring and an epidemiological program is appropriate and necessary;

(m) whether St. Jude designed and manufactured aortic connectors that were dangerously defective because they had a tendency to cause occlusion at the connector sites which could lead to serious adverse health effects including respiratory failure, heart attacks and death;

(n) whether St. Jude concealed adverse information regarding the testing and safety of the aortic connectors used during their bypass surgeries;

(o) what steps, if any, St. Jude took to cure or mitigate the defects in the aortic connectors after it knew of the defects and of the injuries and risks associated with their use;

(p) whether St. Jude is strictly liable to those injured by their defective aortic connectors;

(q) whether St. Jude acted negligently towards Plaintiffs and members of the classes;

(r) whether Plaintiffs and others similarly situated need and would benefit from a notice and registry program, a medical sur-

veillance program, and/or medical research program designed to address the substantially increased risk of harm that St. Jude's defective products have put them in;

(s) whether Class II Plaintiffs have suffered injury and/or death as a result of the implanted St. Jude aortic connector.

(Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 20-22.)

[*19] As for common factual issues, St. Jude contends that any claim of commonality is overshadowed by individual variations in the factual circumstances of each class member. St. Jude points to differences in class members' individual case histories and the fact that complications with the device could be due to surgical error. St. Jude notes that in a failure-to-warn case, each plaintiff's surgeon would be required to testify to determine what oral and written statements were made by St. Jude to the physician, and what he in turn told the patient. *See In re American Medical Sys.*, 27 F.3d at 1081.

c. Typicality of Claims and Defenses of the Representative Parties as Compared to the Class

Rule 23(a)(3)'s typicality requirement requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3).

Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such [*20] a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*In re American Medical Sys.*, 75 F.3d at 1082 (6th Cir. 1996) (quoting 1 Newberg, *supra*, § 3.13, at 3-76). "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with

those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* The plaintiff "whose claim is typical will ordinarily establish the defendants' liability to the entire class by proving his or her individual claim." ALBA CONTE & HERBERT B. NEWBERG, 6 NEWBERG ON CLASS ACTIONS § 18:8, at 29 (4th ed. 2002).

The named plaintiffs contend that their claims are typical because each representative plaintiff's claim arises from the same course of events as other members of each class, apparently referring [*21] to, without explicitly stating, bypass surgery and implantation of the aortic connector. The plaintiffs argue that their claims "involve specific actions taken by St. Jude which affect each class member, including the marketing of thousands of aortic connectors each of which had the same dangerous defect." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 24.) Bostick and Thrasher assert that the relief they seek is exactly the same as the relief sought by absent class members and that each individual claim will rely on the same evidence proving St. Jude's wrongful conduct. (*Id.*) Moreover, the plaintiffs argue that St. Jude's defenses will be the same. (*Id.* at 26.)

St. Jude contends that are "numerous aspects" of the representative class members' claims that establish the absence of typicality. (Opp'n at 24.) In support of its argument, St. Jude directs the court's attention to the case of *In re Baycol Products Litig.*, 218 F.R.D. 197, 205 (D. Minn. 2003), where a district court in Minnesota rejected plaintiff's argument that their claims were typical merely because they involved a single product and the same purported conduct. *Cf. In re Paxil Litigation*, 212 F.R.D. 539, 550 (C.D. Cal. 2003) [*22] ("In focusing its typicality argument almost exclusively on the fact that there is a single defendant [], a single drug [], and a single set of alleged misleading statements nationwide, Plaintiffs misconstrue the typicality requirement.") The court went on to recognize the existence of issues such as "injury, causation, the learned intermediary defense, and comparative fault" would require the presentation of individualized evidence. *Id.* Furthermore, the court noted that "[b]ecause the theories asserted by this putative class are based on what Defendants' knew at the time Baycol was prescribed, and whether Defendants acted reasonably based on such knowledge, the claims of the named representatives are not typical of the class." *Id.* at 205-06; *see also.*

Applying the rationale of *In re Baycol Products Litigation* to the facts at hand, St. Jude argues that the plaintiffs claims are not typical of the classes they seek to represent. First, St. Jude contends that the plaintiffs allege breach of warranty, which may require in some states that plaintiffs present proof that they relied on statements made regarding the product. However, Thrasher and Bostick cannot recall [*23] whether they were informed Dr. Schoettle would be using St. Jude's aortic connector during bypass surgery or not. Thus, St. Jude argues that the plaintiffs are not typical of class members who were informed of the use of aortic connectors. (Opp'n at 24.)

Furthermore, St. Jude asserts that plaintiff Bostick's claims are not typical of the thousands of other patients who received an aortic connector and have experienced no trouble with the device. It contends that other aspects of Thrasher's and Bostick's medical and family histories are unique, which present substantial proof problems that may not be shared by all class members. St. Jude also argues that the plaintiffs' damage claims are not typical of the class and notes that Class II includes aortic connector recipients with claims for wrongful death and survival while the plaintiffs themselves are alive and well. *But see Alpern v. UtiliCorp. United Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) ("The fact that damage calculations might differ slightly for [different plaintiffs] is a minor matter in comparison with the fundamental similarities.") *See also In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 288-89 (S.D. Ohio 1997) [*24] ("No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action.").

d. Adequacy of Representation

The final requirement of Rule 23 (a) is that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a) (4). This rule has two requirements. First, "the representative must have common interests with unnamed members of the class." *In re American Medical Sys.*, 75 F.3d at 1083. Second, "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Id.* The adequate representation requirement "overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.*

In addition to their arguments for typicality, the plaintiffs contend that Thrasher and Bostick possess all of the qualities of adequate class representatives. They assert that each named plaintiff meets the definition of his respective class [*25] and is willing to represent others similarly situated. Thrasher and Bostick have responded to St. Jude's discovery requests and the disclosure requirements of the federal rules. Moreover, both plaintiffs have attended and participated in a class representative deposition. The plaintiffs argue that no facts suggest that Bostick and Thrasher have any conflict or other interest antagonistic to the vigorous pursuit of class

claims against St. Jude on behalf of the entire class. Finally, Bostick and Thrasher propose that they have retained experienced and qualified counsel to vigorously represent the interests of the proposed classes.

St. Jude does not challenge the adequacy and qualifications of plaintiffs' counsel; however, St. Jude does challenge Bostick's and Thrasher's suitability as class representatives on the same grounds upon which it opposed the representative plaintiffs' satisfaction of the typicality requirement.

### 2. Rule 23(b)

Even if the prerequisites of Rule 23 (a) are met, the plaintiff also has the burden of meeting one of the three criteria listed in 23 (b). A class action will be maintained only if one of the criteria of Rule 23(b) is satisfied. In this case, the [*26] plaintiffs seek certification under all three provisions of Rule 23(b). They first seek to certify both classes under Rule 23 (b) (3), which permits certification where plaintiffs can show that common questions predominate and that a class action is the superior method to adjudicate the controversy. Plaintiffs also seek to certify Class I, the medical monitoring class, under Rule 23(b)2), which permits injunctive relief, if plaintiffs can show that St. Jude acted or refused to act on grounds generally applicable to the class. Finally, plaintiffs seek certification of Class I under Rule 23(b)(1)(A), which provides for class certification when separate actions would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class. [6]

> 6   The plaintiffs did not seek class certification under Rule 23 (b) (1) in their complaint. They raise this argument only in their motion for class certification, and plaintiffs' counsel indicated at the hearing that the plaintiffs primarily sought certification of the medical monitoring class under the second and third subsections of Rule 23(b).

[*27]   a. Certification of Medical Monitoring Class under Rule 23 (b)(1) and (b)(2)

St. Jude challenges certification of Class I under Rules 23 (b) (1) and (b) (2) on four grounds. First, St. Jude contends that plaintiffs in Class I do not have constitutional standing to bring a medical monitoring claim. Second, St. Jude argues that medical monitoring is not an injunctive remedy and is therefore unavailable under Rule 23 (b) (2). Third, St. Jude asserts that the medical monitoring class is not sufficiently cohesive. Finally, St. Jude claims that certification under Rule 23(b)(1) is inappropriate because there is no risk of inconsistent judgments.

Rule 23(b)(1)(A) provides for class certification when separate actions would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class. The plaintiffs contend that medical monitoring relief must be uniform to be effective. In response, St. Jude argues that any risk of divergent results from multiple cases exists only because the individual issues surrounding each class members claims will dictate each class member's prospective entitlement to medical monitoring. [*28] Therefore, St. Jude contends that class certification is inappropriate as a altogether.

Rule 23(b)(2) provides that plaintiffs may be eligible for relief when the party opposing certification has acted or refused to act on grounds generally applicable to the class. FED. R. CIV. P. 23(b)(2). The rule permits class actions in which the plaintiffs seek damages, but only in those cases where the *primary* relief sought is injunctive or declaratory. *Alexander v. Aero Lodge No. 735, 565 F.2d 1364, 1372 (6th Cir. 1977)* (emphasis in original). Unlike Rule 23(b)(3), Rule 23(b)(2) has no requirement of superiority or predominance. *In re St. Jude Med., Inc., MDL No. 01-1396, 2004 U.S. Dist. LEXIS 149, at 14 n.7 (D. Minn. Jan. 5, 2004)*. However, the rule does include "an implicit 'cohesiveness' requirement, which precludes certification when individual issues abound." *Thompson v. Am. Tobacco Co., 189 F.R.D. 544, 557 (D. Minn. 1999)* (citing *Barnes v. Am. Tobacco Co., 161 F.3d 127, 143 (3d. Cir. 1998)* (relying on the cohesiveness requirement enunciated [*29] by the Supreme Court in *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*).

Here, Bostick and Thrasher seek medical monitoring relief consisting of a "supervised trust, funded by St. Jude, that would provide to the class the medical procedures and diagnostic tests recommended to uncover the likely conditions resulting from the implantation of an aortic connector." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 37.) The plaintiff's assert that the monitoring program they seek would not provide compensation for any personal injuries that patients have suffered or might suffer. (*Id.* at 37-38.) Furthermore, the plaintiffs contend that the tests and procedures they propose are "not routinely performed as part of a routine follow-up of a patient who has received a bypass surgery." (*Id.* at 38.)

St. Jude contends that Class I may not be certified under this subsection of Rule 23(b) because plaintiffs do not seek equitable relief. St. Jude claims that because the proposed medical monitoring trust fund would be paid for by St. Jude, the medical monitoring claim is equivalent to one for money damages. There is a Tennessee case holding otherwise. In [*30] *Craft v. Vanderbilt Univ., 174 F.R.D. 396, 406-07 (M.D. Tenn. 1996)*, the

court held that an action for court-supervised medical monitoring could qualify as injunctive relief under Rule 23(b)(2). *See also In re St. Jude Med., Inc.*, 2003 U.S. Dist. LEXIS 5188, 2003 WL 1589527 (D. Minn., March 27, 2003); *Day v. NLO, Inc.*, 144 F.R.D. 330, 336 (S.D. Ohio 1992) (holding that a medical monitoring program could constitute injunctive relief as required by Rule 23 (b) (2)). *But see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195-96 (9th Cir. 2001) (addressing *Craft* decision and citing other cases where the equitable nature of medical monitoring was at issue). The key query is whether the plaintiffs can demonstrate that the "primary relief they are seeking is injunctive or declaratory" as opposed to a request for what is essentially monetary relief. *Kurczi*, 160 F.R.D. 667, at 672.

b. Predominance of Common Issues Versus Individual Issues under Rule 23(b)(3) for Classes I and II

The plaintiffs argue that both classes can be certified under Rule 23 (b) (3). This rule has two requirements: (1) that common questions of law [*31] or fact predominate over any questions affecting only individual class members and (2) that a class action is superior to other available methods of adjudicating the controversy. FED. R. CIV. P. 23 (b) (3). This rule parallels Rule 23 (a) (2) in that both subdivisions require that common issues exist, but 23(b)(3)'s predominance test goes further by insuring that the common issues predominate over individual issues. *In re American Medical Sys.* 75 F.R.D. at 1084.

St. Jude argues that certification under Rule 23(b)(3) is not appropriate because there are too many factual and legal differences among the class members, thereby destroying predominance. Furthermore, St. Jude contends that a class action would not be a superior method of adjudicating either class's allegations because of the inherent difficulties in dealing with the laws of many states.

"[A] claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual issues." *Weinberg v. Insituform Techs.*, 1995 U.S. Dist. LEXIS 5124, No. 93-2742, 1995 WL 368002, [*32] at *7 (W.D. Tenn. April 7, 1995) (Gibbons, C.J.). "Predominance is usually decided on the question of liability, so that if the liability issue is common to the class, common questions are held to predominate over individual ones." *Id.*

The plaintiffs contend that the controlling issues of whether aortic connectors are defective, and whether St. Jude was negligent in failing to adequately test the product before placing in the stream of commerce "plainly predominate over any individual issues in this case."

(Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 33.) The plaintiffs also argue that as to Class I, there are no legally relevant individual issues at all because Dr. Frank Martin contends that anyone with an aortic connector is injured by the aortic connector's presence in them alone and thus requires monitoring. (Pls.' at 33.) The plaintiffs do not address the fact that all class members claims will not be governed under the law of a single jurisdiction. Various jurisdictions have rejected class certification where the applicable states' laws vary and preclude a finding that common issues predominate. *In re American Medical Sys.* 75 F.3d at 1085. [*33]

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of settling the controversy. . . ." Wright, 7 *Federal Practice & Procedure*, § 1780 at 562. Rule 23(b)(3) identifies four factors which should be examined by the court to determine whether class treatment would be fair and efficient:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

> (D) the difficulties likely to be encountered in the management of a class action.

FED. R. CIV. P. 23 (b) (3) (A) -- (D). In analyzing superiority, the court primarily considers "the difficulties likely to be encountered in the management of a class action." FED. R. CIV. P. 23 (b) (3). Here, the main factor affecting superiority involves application of state law to plaintiff's [*34] claims. Even if common questions of law exist, the application of multiple state laws may render the case unmanageable as a class action. *See Telectronics*, 172 F.R.D. at 290-91.

Bostick and Thrasher claim that variations in state law should not bar this class action and assert that "[i]f the elements of the cause of action are the same and legal standards on significant issues are substantially similar the state laws can be grouped for purposes of class certification." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 34 (citing *Telectronics*, 172 F.R.D. at 292).)

B. Certification of a Nationwide Class

After a careful review of the record, argument presented at the hearing, and the briefs submitted to the court, it is clear that the plaintiffs have not carried their burden of establishing that this medical product liability action is maintainable or manageable as a nationwide class under either prong of Rule 23. Turning first to the threshold requirements of Rule 23(a), the plaintiffs have not presented any argument or evidence to the court as to how choice of law considerations and variations in state law can be reconciled [*35] with the requirements of commonality, typicality, and adequate representation of a nationwide medical monitoring or personal injury class.

Before the court can determine, for instance, whether the commonality requirement of Rule 23(a)(2) is satisfied, the court must undertake a choice of law analysis to determine which state's law applies to the claims of each class member. See In re American Medical Sys., 75 F.3d 1069, 1085 (6th Cir.). In diversity cases, a federal court must apply the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg., 313 U. S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Thus, Tennessee's choice of law rules will apply to this case. Tennessee follows the approach of the Restatement (Second) of Conflicts of Laws and "provides that the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation." Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992). The plaintiffs have averred that approximately 40,000 patients in all fifty states have received the aortic connector in bypass surgeries. Therefore, the possibility exists that the laws of all fifty [*36] states could apply to the rights and liabilities of the parties.

With state law differences on issues such as strict product liability, negligence, medical monitoring, and the availability of affirmative defenses, such as comparative fault and the learned intermediary doctrine, this court finds it difficult to see a common legal standard applicable to all class members, and the plaintiffs have not provided the court with any analysis on the issue. At most, the plaintiffs have listed generic "common questions" that can be characterized as "common" at the most superficial level. For instance, the plaintiffs include within their list of common questions issues such as whether St. Jude is strictly liable, whether St. Jude is negligent, and whether a medical monitoring program is appropriate and necessary. Because a choice of law analysis will be required to determine the law to be applied to the claims of each class member, the law that applies to these questions necessarily will differ as to each class member. Even the basic question of whether St. Jude's aortic connectors are defective will depend on the application of the laws of all fifty states and perhaps upon facts particular to [*37] each individual plaintiff.

The plaintiffs, both in their briefs and during oral argument, merely gloss over the choice of law issues. They give the court general assurances that any issues arising out of state law variations will be overcome. They have not submitted to the court a plan as to how the differences in state law could be managed. Without more, the plaintiffs have failed to meet their burden of proof under Rule 23 and have not illustrated that a common question of law exists, much less predominates as required under Rule 23(b)(3). See Chin v. Chrysler Corp., 182 F.R.D. 448, 453 (D.N.J. 1998) (finding that the plaintiff failed to meet its burden to "credibly demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles'"); In re American Medical Sys. 75 F.3d at 1079, 1085. For this reason and for others that will be discussed below in the court's analysis of the certification of a Tennessee class, this court does not recommend the certification of Class I or II on a nationwide basis.

C. Certification of a Tennessee Class Action

In the alternative to a nationwide [*38] class, the plaintiffs seek certification of a Tennessee class action with two subclasses limited to patients who received the aortic connector in Tennessee. St. Jude asserts, however, that limiting the classes to Tennessee will not solve the problem plaintiffs face with state law variations because patients receiving the bypass in Tennessee may reside elsewhere, which would necessitate a choice of law analysis for the claims of each Tennessee class member. As this court stated above in the court's choice of law analysis for a nationwide class, there is a presumption in Tennessee that the law of the location of the injury controls. Under the plaintiffs' theory of this case, the location of the alleged injury is the place where the patients were implanted with the aortic connector and that place would be Tennessee under the plaintiffs' alternative class definition. In light of the place-of-injury presumption, this court submits that narrowing the medical monitoring class and personal injury class to Tennessee would in fact remove the overwhelming choice-of-law issues facing a nationwide class. The plaintiffs have asserted, without challenge by St. Jude, that at least 300 aortic connectors [*39] have been implanted in the state of Tennessee. That figure, as opposed to the 40,000 possible nationwide class members, would be manageable even if the court had to determine if another state had a more significant relationship to the plaintiffs' claims. Thus, there are common issues of law in a Tennessee class, and there is no dispute as to the numerosity requirement. Accordingly, the court must analyze the two Tennessee classes in more detail to determine whether the other requirements of Rule 23 are satisfied.

1. Class I -- The Medical Monitoring Class

At the outset, the court must address whether Class I has standing to bring an action for medical monitoring because standing is a requirement of Article III. *Sutton v. St. Jude Med., Inc.*, 292 F. Supp. 2d 1005, 1007 (W.D. Tenn. 2003) (citations omitted) ("Standing must be determined at the outset of litigation, as failure of a plaintiff to show standing deprives the federal courts of jurisdiction to hear the case."); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612-13, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints . . .")

The burden [*40] is on the plaintiff to prove standing. Standing consists of three elements: (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal connection between the injury and the defendant's conduct of which the plaintiff complains; and (3) it must be likely that the injury will be redressed by a favorable decision. *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). The "injury in fact must be actual or imminent, not conjectural or hypothetical." *Id.* Furthermore, in a class action, "the named plaintiff must allege an individual personal injury in order to seek relief on behalf of himself, or herself, or any other member of a class." *Id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)). When analyzing standing at the class certification stage, the court assumes the truth of facts alleged by the plaintiff. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

The plaintiffs have stated in support of their motion for class certification that "[t]here can be no confusion as to who belongs to Class I. Quite simply, Class I includes every U.S. or Tennessee patient who [*41] still has an aortic connector." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 12.) At the hearing, plaintiffs' counsel repeatedly referred to Class I as the class encompassing those patients who have been implanted with the aortic connector but are asymptomatic or without injury. After the hearing, however, the plaintiffs filed a Supplemental Statement Regarding Oral Argument on Motion for Class Certification that indicated that Class I also includes patients like Bostick who have allegedly suffered injury related to the aortic connector. (See Pls.' Supplemental Statement Regarding Oral Argument at 1.) Thus, proposed Class I includes not only those people who have allegedly been injured but also patients who have experienced no trouble whatsoever with the implantation of the connector.

In addition to proposed class members who allege injury in fact, the plaintiffs argue that all members of Class I have been injured merely by the aortic connector's presence in their bodies. The plaintiffs cite the opinion of Dr. Martin, the study conducted by Dr. Schoettle,

and statements made by Dr. Klima as support for their assertion. (See Pls.' Mem. of Law in Supp. of Motion [*42] for Class Certification at 33.) The argument plaintiffs make here is basically the same argument made by the plaintiff in *Sutton v. St. Jude Medical, Inc.*, 292 F. Supp. 2d 1005, 1007 (W.D. Tenn. 2003).

In *Sutton*, the plaintiff represented a class of individuals who had had an aortic connector implanted in their bodies. *Id.* While some patients included in the class had actually incurred physical injuries, the plaintiff had not suffered any physical injury or medical consequences from implantation of the aortic connector. *Id.* Nevertheless, the plaintiff argued that he and similarly situated class members suffered an increased risk of physical complications by merely having the device. *Id.* The issue confronted by the District Court of Western Tennessee in Sutton was "whether [plaintiff's] increased risk of complications constitutes an 'injury in fact' sufficient to confer standing." *Id.* The court noted that the issue was one of first impression in Tennessee. *Id.* After analyzing cases outside the Sixth Circuit, including a case specifically relied upon by Bostick and Thrasher in the present case, [7] the *Sutton* court held that the plaintiff's [*43] increased risk of harm did not meet the "constitutional requirement that an injury be neither 'conjectural' nor 'hypothetical'" because the plaintiff had not presented any evidence of increased risks or complications among aortic connector recipients or any specific incidents of harm. *Id.* at 1008. Consequently, the court found that the plaintiff was unable to demonstrate standing and the court was without jurisdiction to hear the case. *Id.*

7   The plaintiffs rely on an unreported medical device products liability case currently pending in the District of Minnesota in support of their increased risk of harm argument. In *In re St. Jude Med., Inc.*, No. MDL 01-1396 JRTFLN, 2003 WL 1589527 at *11-12 (D. Minn. March 27, 2003), a district court found that a class of patients who had heart valve implants, but who had not suffered any injurious side effects as a result, had an increased risk of harm constituting injury in fact. That medical monitoring class, however, was later limited to patients from fifteen states in which medical monitoring is recognized as a stand-alone cause of action, without proof of injury. In *In re St. Jude Med., Inc.*, No. MDL 01-1396 JRTFLN, 2004 U.S. Dist. LEXIS 149 at *17 (D. Minn. Jan. 5, 2004). Tennessee was originally included as a state recognizing such a claim but was withdrawn from the class in a later order. *See In re St. Jude Med., Inc.*, No. MDL 01-1396 JRTFLN, 2004 U.S. Dist. LEXIS 13965 at *15-16 (D. Minn. July 15, 2004). Accordingly, this case no longer supports Bostick's and

Thrasher's increased risk of harm argument because Tennessee was specifically excluded from the medical monitoring class.

[*44] Here, Bostick and Thrasher are essentially making the same "increased risk of harm" argument. Unlike the plaintiff in *Sutton*, however, Bostick and Thrasher have presented what they contend is evidence of an increased risk of harm associated with the aortic connector by way of a study performed by Dr. Schoettle, comments made by Dr. Klima, and an affidavit filed by Dr. Martin. The evidence presented, however, does not demonstrate to a reasonable medical certainty that the aortic connector, in and of itself, increases the risk of physical complications. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1204-05 (6th Cir. 1988).

In light of the court's ruling in *Sutton*, this court finds that the asymptomatic members of Class I lack standing to bring an action for medical monitoring under the laws of Tennessee. Moreover, not only have the plaintiffs failed to demonstrate that asymptomatic Class I members have standing, they have not presented to the court any case law from Tennessee supporting their assertion that Tennessee recognizes an action for medical monitoring in the absence of a present injury. In fact, a review of the applicable case law reveals that [*45] Tennessee does require a present injury. *See In re St. Jude Med., Inc., Silzone Heart Valves Prods. Liab. Litig.*, MDL No. 01-1396(JRT/FLN), 2004 U.S. Dist. LEXIS 13965 at *12 n.3 (July 15, 2004) (noting that Tennessee requires present injury for medical monitoring claims); *Jones v. Brush Wellman, Inc.*, 2000 U.S. Dist. LEXIS 21897, No. 1:00 CV 0777, 2000 WL 33727733 at *8 (N.D. Ohio, Sept. 13, 2000) ("No Tennessee cases support a cause of action for medical monitoring in the absence of a present injury."); *Potts v. Celotex Corp.*, 796 S.W.2d 678, 681 (Tenn 1990). Because there can be no showing that each class member has been injured, this court recommends that a medical monitoring class not be certified because the class is overly broad and lacks standing.

The court also recommends that Class I not be certified on the grounds that plaintiff Bostick is not an adequate class representative as required by *Rule 23(a)(4)*. Bostick is said to represent Class I and Class II because he still has an aortic connector and has been injured, although not injured enough to require the removal of the device. However, Bostick does not represent those members of Class I that are [*46] asymptomatic because he alleges he has been injured. An adequate class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); *see In re Baycol Prods. Litig.*, 218 F.R.D. 197, 210-11 (D. Minn.

2003) ("Given the nature of a medical monitoring claim, the Court is not convinced that the named representatives will adequately represent the interests of those class members who have not suffered any injury as a result of taking Baycol. . . ."). As a patient who allegedly has been injured by the implantation of the aortic connector, Bostick cannot adequately represent the portion of Class I that has experienced no problem whatsoever with the device.

The fact that Bostick has been injured also affects his satisfaction of the typicality requirement of *Rule 23(a)(3)*. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (no typicality where class representative alleges different injuries from those suffered by other class members).

As the definition for Class I stands, an undetermined portion of the [*47] class has not established standing to bring an action for medical monitoring because they lack an injury-in-fact as required under Tennessee law, and they are not adequately represented by plaintiff Bostick who has allegedly sustained an injury. In addition, Bostick claims are not typical of the other members of the medical monitoring class. While the court has the discretion to redefine the class, it is recommended that the court decline to exercise that discretion. Accordingly, it is recommended that the plaintiffs' motion to certify a Tennessee medical monitoring class be denied.

2. Class II -- The Personal Injury Class

In addition to its argument that the plaintiffs cannot satisfy the requirements of *Rule 23* for a personal injury Tennessee class, St. Jude contends that the definition of Class II, which is limited to patients who have "sustained presently compensable physical injuries due to the aortic connecter," is an improper definition because "it purports to identify the class member by reference to the ultimate question in this case -- whether either plaintiff or any individual they purport to represent has a 'presently compensable injury due to the aortic connector. [*48] '" (Opp'n at 26.) The court need not conduct a detailed evaluation of the requirements of *Rule 23 (a)* and *23 (b)* and an analysis of whether those requirements are met in this instance, because the court agrees with St. Jude's argument that the definition of Class II is an improper definition.

"Although not specifically mentioned in *Rule 23 (a)*, a class must be sufficiently definite in order to warrant certification." *Hagen v. Winnemucca*, 108 F.R.D. 61, 63 (D. Nev. 1985). An inquiry into the merits of the case should not be required of the court in its determination of whether a person is a member of a class. *Id. at 63-64*; *accord Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995) (rejecting class defined to include all those who "received unsolicited facsimile advertise-

ments" because determination of class membership wold require a "mini-hearing on the merits" as to the central issue of liability); _Dunn v. Midwest Buslines, Inc._, 94 F.R.D. 170, 172 (E.D. Ark. 1982) (finding class definition "vague [] and ambigu[ous]" where class definition depended on an initial determination by the court that the [*49] each potential class member experienced discrimination); _see also Telectronics Pacing Sys., Inc._, 172 F.R.D. at 282 ("While the Court must probe behind the pleadings in order to determine if class certification is proper, it is inappropriate for the Court to examine the merits of the claim in doing so."). The ascertainability of class member is important so a court can decide "who will receive notice, who will share in any recovery, and who will be bound by the judgment." _Van West v. Midland Nat'l Life Ins. Co._, 199 F.R.D. 448, 451 (D.R.I. 2001). The requirement of ascertainability "is not satisfied when the class is defined simply as consisting of all persons who may have been injured by some generically described wrongful conduct allegedly engaged in by a defendant." _Id._

This appears to be exactly what the plaintiffs have done in this case in their definition of Class II. To establish who belongs in the personal injury class, the court would have to conduct "mini-trials on the merits" to determine the patients who have "sustained presently compensable physical injuries due to the aortic connector." The fact that the aortic connector caused injury [*50] to each bypass patient would have to be established before class notice could be issued. Furthermore, the court

would have the daunting task of determining whether the injury caused by the aortic connector is "presently compensable" for over 300 patients receiving the device in Tennessee. As St. Jude has indicated to the court, such a determination "would involve all the diverse issues of liability, causation, etc. that these claims present" and would essentially require the adjudication of every potential class member's individual claim. (Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Certification at 27.) Because the members of Class II are not presently ascertainable without an adjudication of the merits of their claim, it is recommended that the court decline class certification of a Tennessee personal injury class as Class II is presently defined. Therefore, this court finds it unnecessary to complete further analysis of class certification pursuant to Federal Rule of Procedure 23.

CONCLUSION

Accordingly, for the reasons stated herein, it is recommended that the plaintiffs' motion for certification of a nationwide class, a Tennessee medical monitoring class, and a Tennessee [*51] personal injury class be denied.

Respectfully submitted this 17th day of August, 2004.

DIANE K. VESCOVO

UNITED STATES MAGISTRATE JUDGE

LEXSEE



Cited
As of: Feb 17, 2012

**PATRICK R. COLABELLA and COLABELLA & COMPANY, Plaintiffs, - against - AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, NEW YORK STATE SOCIETY OF CERTIFIED PUBLIC ACCOUNTANTS, SAMUEL M. BRONSKY, and THOMAS W. MORRIS, Defendants.**

**10-cv-2291 (KAM)(ALC)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2011 U.S. Dist. LEXIS 110982**

**September 28, 2011, Decided**
**September 28, 2011, Filed**

**CORE TERMS:** peer reviews, peer reviews, entity, engagement, antitrust, reviewer, peer, peer-review, deprivation, accounting, state actor, conducting, suspension, notice, public accountant, private entity, prong, nexus, Robinson-Patman Act, state action, audit, public function, commodity, state law, declaratory judgment, entwinement, membership, federal claims, failure to state a claim, peer-reviewed

**COUNSEL:** [*1] For Patrick R. Colabella, Colabella & Company, LLP, Plaintiffs: Richard S. Bonfiglio, The Law Firm of Richard S. Bonfiglio, Esq., Brooklyn, NY.

For American Institute of Certified Public Accountants, New York State Society of Certified Public Accountants, Samuel M. Bronsky, Thomas W. Morris, Defendants: Joseph W Muccia, Thompson Hine LLP, New York, NY.

**JUDGES:** Kiyo A. Matsumoto, United States District Judge.

**OPINION BY:** Kiyo A. Matsumoto

**OPINION**

**MEMORANDUM & ORDER**

  **MATSUMOTO,** UNITED STATES DISTRICT JUDGE:

  Certified public accountant Patrick R. Colabella ("Colabella") and his accounting practice, Colabella & Company, LLP ("Colabella & Company") (collectively, "plaintiffs"), commenced this action against defendants American Institute of Certified Public Accountants ("AICPA"), New York State Society of Certified Public Accountants ("NYSSCPA") and NYSSCPA officers Samuel M. Bronsky ("Bronsky") and Thomas W. Morris ("Morris") (collectively, "defendants"), seeking declaratory relief and damages, alleging, *inter alia*, under federal and state law that pursuant to 42 U.S.C. § 1983, defendants unlawfully deprived Colabella of his right to conduct peer reviews of fellow Certified Public Accountants ("CPAs") under the auspices [*2] of AICPA and NYSSCPA; unlawfully subjected him to loss of business profits; and violated certain sections of the Sherman and Clayton Acts by monopolizing the market for peer review of CPAs in New York State. Defendants move to dismiss the Amended Complaint (ECF No. 12, "Am. Compl.") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").[1] For the reasons that follow, defendants' Rule 12(b)(6) motions are granted as to plaintiffs' federal claims. In addition, the court declines in its discretion to exercise supplemental jurisdiction over plaintiffs' state law claims because none of the federal claims survive this motion to dismiss. Therefore, the court also dismisses plaintiffs' state law claims, without prejudice to re-file such claims in state court.

1    The parties have submitted the following briefs in connection with defendants' motions to dismiss: ECF No. 18, Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs.' Mem."); ECF No. 22, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Pls.' Opp'n"); and ECF No. 20, Reply Memorandum of Law In Support of [*3] Defendants' Motion to Dismiss the Amended Complaint ("Defs.' Reply").

## BACKGROUND

### I. Facts

The following facts are drawn from plaintiffs' Amended Complaint and are taken as true, except where noted, for purposes of this motion.

### A. The Parties

Plaintiff Colabella is a CPA licensed to practice as a public accountant in New York State; he received his license in 1973, and has actively practiced in New York and elsewhere since that time. (Am. Compl. ¶ 111.) Plaintiff Colabella & Company is his accounting practice. (*Id.* ¶¶ 6, 200.) Colabella has never been suspended or disciplined by the New York State Education Department or the State Board of Accounting, the entities that govern admission to and regulation of the practice of accounting. (*Id.* ¶¶ 107, 111.) In addition, at all times relevant to the present action, he was a member in good standing of two national professional associations for CPAs: AICPA and NYSSCPA. (*Id.* ¶¶ 46, 60, 100.)

Defendant AICPA is a national professional organization that solicits membership among CPAs in each of the United States, the District of Columbia and elsewhere. (*Id.* ¶¶ 1, 100.) Defendant NYSSCPA, a professional organization for CPAs in the State of New York, [*4] acts on behalf of AICPA to administer certain functions. (*Id.* ¶¶ 63, 102.) Defendants Bronsky and Morris were, at all relevant times, officers of NYSSCPA. (*Id.* ¶¶ 3-4.)

### B. Role of the AICPA In Certified Public Accountancy[2]

2    Because adjudication of defendants' motion to dismiss requires context regarding the accounting profession, peer review of CPAs and the role of the AICPA, sections B and C herein provide relevant background facts pleaded in the Amended Complaint, while sections D and E set forth the alleged facts immediately underlying plaintiffs' claims.

Although public accountants perform a broad range of accounting, auditing, tax and consulting activities for their clients, some functions--such as filing a report with the United States Securities and Exchange Commission ("SEC"), for instance --must be performed by a CPA. (Am. Compl. ¶¶ 11.A, G.) Authority to license CPAs resides within each state's Board of Accountancy. (*Id.* ¶ 11.H.) Passage of the Uniform CPA Examination, which is prepared and graded by AICPA, is required by the Boards of Accounting in all fifty states as a prerequisite to CPA licensure. (*Id.* ¶¶ 11.H-J., 110.) Membership in professional organizations such as AICPA [*5] and NYSSCPA is not required for one to remain in good standing as a licensed CPA, however. (*Id.* ¶¶ 101, 103.)

Standards issued by AICPA are often incorporated into frameworks and guidelines used for conducting audits of private, public and government entities. (*Id.* ¶¶ 12, 30, 32.) The Generally Accepted Auditing Standards ("GAAS"), which govern private-sector financial statement audits, are established largely by AICPA. (*Id.* ¶¶ 12.C-E.) In addition, AICPA contributes to Generally Accepted Accounting Principles ("GAAP"), which are conventions, rules and procedures that define accepted financial accounting practices for public companies. (*Id.* ¶¶ 12.F-H, 13-16.) Moreover, various standards and criteria first established by AICPA are incorporated into the Generally Accepted Government Auditing Standards ("GAGAS"), which are used for audits of government entities and entities that receive government awards. (*Id.* ¶¶ 24-36.)

### C. Peer Review of Certified Public Accountants

Through the peer-review process, CPAs independently assess each others' work to evaluate and maintain the quality of work within the profession. (Am. Compl. ¶¶ 48, 50.) Peer review is mandated by law for CPAs in forty-two states; [*6] notably, however, peer review is not yet compulsory for CPAs in New York State.[3] (*Id.* ¶¶ 52.F., 112.)

3    The State of New York recently enacted New York Education Law § 7410, which makes peer review mandatory for CPAs, but the law does not go into effect until January 1, 2012. (Am. Compl. ¶ 112.)

Even where the law does not necessarily mandate peer review, a CPA's clientele, or the nature of his or her work, may require it. Any CPA firm required to register with the Public Company Accounting Oversight Board ("PCAOB") must submit to periodic peer review by the PCAOB.[4] (*Id.* ¶¶ 52.G., 114-18.) In addition, regulations

promulgated by various government agencies make peer review obligatory for CPAs who engage in specific types of work, including audits of: government entities; entities that receive government awards; FDIC-insured and Federally Insured Thrift institutions; publicly traded companies; and borrowers of the Rural Utility Service. (*Id.* ¶¶ 52.A-E.)

> 4   The Sarbanes-Oxley Act of 2002 created the PCAOB, which is charged with the oversight, regulation, inspection, and discipline of American and foreign accounting firms that audit public companies. (*Id.* ¶ 21.)

Separately, any CPA who seeks  [*7] admission to or retention of membership in AICPA must be enrolled in a "practice-monitoring," or peer-review, program. (*Id.* ¶ 53.) AICPA maintains its own "Peer-Review Program" (the "PRP"), although AICPA itself does not perform peer reviews; rather, the peer reviews are conducted by entities approved by AICPA to perform such evaluations. (*Id.* ¶¶ 55, 57.) Firms and individuals who choose to enroll in the PRP must undergo triennial peer reviews conducted by independent evaluators known as "peer reviewer[s]," who are authorized by the AICPA to perform the peer reviews. (*Id.* ¶ 57.)

AICPA has promulgated standards for the administration, planning, performance, reporting and acceptance of peer reviews conducted by its peer reviewers for CPA firms and individuals enrolled in the PRP. (*Id.* ¶¶ 55, 67-95.) Under these standards, an entity that administers the PRP on behalf of AICPA may appoint a "peer review committee to oversee the administration, acceptance and completion of peer reviews." (*Id.* ¶ 77.) NYSSCPA, which administers the PRP on behalf of AICPA in the State of New York, is bound by all of the PRP standards promulgated by AICPA, and oversees peer reviews conducted as part of the PRP  [*8] in New York, the firm or CPA being reviewed, and the peer reviewer. (*Id.* ¶¶ 64, 76.)

AICPA's Peer Review Board supervises NYSSCPA to ensure compliance with, and consistency in the implementation of, AICPA's standards for peer review. (*Id.* ¶ 64.) Those standards make clear that reviewed firms, peer reviewers and the administering entity (NYSSCPA, in New York) are expected to cooperate in the oversight process, and AICPA has issued procedures to be followed if a reviewer "fails to cooperate in a timely, professional manner." (*Id.* ¶¶ 64, 94.) In the event that NYSSCPA and either the peer reviewer or the reviewed firm cannot resolve a disagreement through good-faith efforts, NYSSCPA may request referral of the matter to AICPA's Peer Review Board. (*Id.* ¶¶ 69, 78.)

**D. Section 1983 and Tort Claims**

The facts, assumed to be true for purposes of this motion, are alleged in the Amended Complaint as follows. In May 1988, Colabella qualified to become a peer reviewer for the PRP, based on criteria established by AICPA. (Am. Compl. ¶ 199.) Since then, Colabella (acting through Colabella & Company) has conducted peer reviews of CPA firms under the auspices of AICPA and NYSSCPA, and plaintiffs have derived  [*9] material income from those peer-review engagements. (*Id.* ¶¶ 200, 202.)

This action arose out of Colabella's participation in the PRP as a peer reviewer of four companies and individuals who were members in good standing of NYSSCPA and AICPA. The first peer-review engagement at issue began on October 25, 2007, when Colabella commenced a peer review of FL&Z,[5] a public accounting company ("FL&Z Engagement"). (*Id.* ¶¶ 128-29.) He conducted the FL&Z Engagement in a timely, competent, and professional manner, and consulted with an NYSSCPA technical reviewer for assistance prior to submitting his proposed findings to NYSSCPA on April 23, 2008. (*Id.* ¶¶ 130-132.)

> 5   As noted in the Amended Complaint, the reviewed firms have been assigned fictitious names. (*Id.* ¶¶ 128, 133, 138, 142.)

The second peer-review engagement at issue began on December 16, 2007, when Colabella commenced a peer review of DK&W, a public accounting company ("DK&W Engagement"). (*Id.* ¶¶ 142-43.) He conducted the DK&W Engagement in a timely, competent, and professional manner, and submitted his proposed findings to NYSSCPA on February 26, 2008. (*Id.* ¶¶ 144-45.)

The third peer-review engagement at issue began on January 17, 2008,  [*10] when Colabella commenced a peer review of RMB, a public accountant ("RMB Engagement"). (*Id.* ¶¶ 138-39.) Colabella conducted the RMB Engagement in a timely, competent, and professional manner, and submitted his proposed findings to NYSSCPA on June 30, 2008. (*Id.* ¶¶ 140-41.)

The last peer-review engagement at issue began on April 30, 2008, when Colabella commenced a peer review of IK, a public accountant ("IK Engagement"). (*Id.* ¶¶ 133-34.) Colabella conducted the IK Engagement in a timely, competent, and professional manner, and submitted his proposed findings to NYSSCPA on June 30, 2008. (*Id.* ¶¶ 135-36.)

Upon review of Colabella's proposed findings in each of the above-mentioned Engagements, defendants Bronsky and Morris, both members of NYSSCPA's Peer Review Committee (Bronsky was Chairman of the Peer Review Committee), issued a series of notices to Co-

labella regarding his peer-review submissions for the FL&Z, DK&W, RMB, and IK Engagements. (*Id.* ¶¶ 146-48, 152, 162.) In each notice, Bronsky and Morris demanded that Colabella make certain changes to his proposed findings. (*Id.* ¶ 151.) Colabella did not make all of the changes demanded, however, because in plaintiff's opinion, they were [*11] stylistic rather than substantive, and unrelated to the accuracy, quality, and professionalism of his actual reports. (*Id.* ¶¶ 147, 151.) Consequently, in Colabella's estimation, the changes demanded were not "necessary" under the guidelines issued by AICPA and NYSSCPA, and did not warrant issuance of notices from Bronsky and Morris because Colabella was actually in compliance with all relevant guidelines. (*Id.* ¶ 151.) Bronsky and Morris persisted in issuing notices to plaintiff, however, because he did not make all of the changes they demanded. (*Id.* ¶ 147.) Colabella alleges that their notices overstated any actual unresolved issues between Colabella and his NYSSCPA technical reviewers; created the appearance of his non-compliance with AICPA's peer review standards and guidelines; and mischaracterized him as uncooperative, when in fact he was merely expressing an "independent, professional dispute" with the basis for and manner in which the Peer Review Committee reviewed his work product. (*Id.* ¶¶ 147-149.) The issuance of repeated notices from Bronsky and Morris resulted in Colabella's immediate suspension from the practice of conducting peer reviews on behalf of AICPA and NYSSCPA [*12] without the benefit of a prior hearing to determine the propriety of the issuance of such notices.[6] (*Id.* ¶¶ 156, 172, 195.)

> 6   Plaintiffs allege that Colabella was suspended from engaging in "any further [p]eer [r]eviews" in the State of New York and elsewhere due to the issuance of notices from Bronsky and Morris. (Am. Compl. ¶¶ 156, 172.) Those allegations do not make sense in light of other facts pleaded in the Amended Complaint, namely, that firms registered with the PCAOB must undergo peer reviews routinely (id. ¶ 52.G), and that all CPAs for whom peer review is mandatory and who "are *not registered and supervised by the PCAOB*" must be peer-reviewed by AICPA through NYSSCPA (id. ¶¶ 114-18, 195) (emphasis added). The well-pleaded allegations indicate that peer reviews in New York State are conducted by at least two organizations: PCAOB and NYSSCPA. Plaintiffs have not pled any relationship between PCAOB and AICPA or NYSSCPA, such that suspension under NYSSCPA's PRP would foreclose Colabella's ability to perform peer reviews for another organization such as PCAOB. "Allegations are not well pleaded if they are 'made indefinite or erroneous by other allegations in the same

complaint.'" [*13] *Am. Centennial Ins. Co. v. Seguros La Republica, S.A.*, No. 91-CV-1235, 1996 U.S. Dist. LEXIS 7729, 1996 WL 304436, at *16 (S.D.N.Y. June 5, 1996) (quoting *Trans World Airlines, Inc. v. Hughes*, 308 F. Supp. 679, 683 (S.D.N.Y. 1969)). Therefore, "draw[ing] all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), while disregarding allegations that are not well-pleaded, the court accepts as fact that Colabella was suspended only from engaging in any further peer reviews on behalf of AICPA and NYSSCPA as a result of the notices issued by Bronsky and Morris.

In addition, on June 25, 2008, Bronsky ordered Colabella to produce proof of his compliance with the continuing professional education ("CPE") requirements mandated by AICPA and NYSSCPA. (*Id.* ¶ 162.) Colabella furnished proof of his total CPE credits on July 10, 2008, demonstrating that he had earned sufficient credits in specific subcategories in satisfaction of the CPE requirements of New York State, AICPA and NYSSCPA. (*Id.* ¶¶ 157-163; ECF No. 12, Ex. A, Summary of Continuing Professional Education Credits, dated August 5, 2005-November 15, 2009 ("CPE Credit Summary").)[7] [*14] Nevertheless, Bronsky rejected Colabella's proof and refused to credit him with sufficient compliance with GAGAS requirements, knowing that a finding of Colabella's non-compliance with CPE requirements would disqualify him from conducting further peer reviews until sufficient proof of compliance was submitted and accepted by NYSSCPA's Peer Review Committee. (Am. Compl. ¶¶ 164-65.)

> 7   Contrary to Colabella's assertion that the CPE Credit Summary reflects that he earned "in excess of 273 hours of total continuing education, in excess of 127 hours of which were in satisfaction of the 80 hour requirement . . . and 100 hours of which were in satisfaction of the 24 hour government auditing requirement," the CPE Credit Summary instead shows that *as of July 10, 2008* (the date on which Colabella furnished the CPE Credit Summary to Bronsky), plaintiff had earned 208.5 hours of total continuing education; 82.5 hours in satisfaction of the "80-hour requirement"; and 80 hours in satisfaction of the "24-hour government auditing requirement." (CPE Credit Summary.) The CPE Credit Summary accounts for continuing education credits accrued between August 5, 2005, and November 15, 2009, but the court will [*15] consider only data on the CPE Credit Summary that reflects hours accrued as of July 10, 2008, because the court

"need not feel constrained to accept as truth conflicting pleadings . . . that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely . . . ." *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 405-406 (S.D.N.Y. 2001); *see also Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261, 2011 U.S. Dist. LEXIS 46867, 2011 WL 1655575, at *8 (E.D.N.Y. May 2, 2011) (if documents deemed to be part of the complaint contradict the complaint's allegations, "the documents control" and the court need not accept the complaint's misstatements as true) (quoting *Rapoport v. Asia Elecs. Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

In a January 8, 2009 letter addressed to Susan Coffey, Colabella complained to AICPA about NYSSCPA's Peer Review Committee, alleging that the NYSSCPA improperly noticed and suspended him on the basis of "repetitive, arbitrary and unfounded criticisms" of his work that were inconsistent with sound administration of the PRP. (*Id.* ¶¶ 174-75.) On July 8, 2009, PRP Director Gary Freundlich advised Colabella that an [*16] ad hoc committee of AICPA's Peer Review Board (the "Ad Hoc Committee") would hold a hearing to consider all outstanding issues, and its decision on the issues would be final. (*Id.* ¶¶ 175-76.) A body of materials to be used in the Ad Hoc Committee hearing—including peer-review documents, emails, and written correspondence—was served on Colabella and NYSSCPA in advance of the hearing. (*Id.* ¶¶ 177-78.) When the Ad Hoc Committee convened to consider the identified issues on August 31, 2009, it did not call for any testimony from Colabella or accept any argument from his counsel. (*Id.* ¶ 178.) Two days later, chairperson Susan Lieberum advised Colabella of the following findings and recommendations of the Ad Hoc Committee, *inter alia*: (1) that with respect to the DK&W Engagement, Colabella did not meet government-specific CPE requirements, and consequently, he was unqualified to perform the Engagement; (2) that with respect to the FL&Z and RMB Engagements (a) NYSSCPA's comments with respect to Colabella's work were valid, and he should have revised documents as requested on a timely basis, (b) Colabella should be given feedback for not doing so, and (c) "[i]n [*17] fairness to the reviewed firm," NYSSCPA should accept the peer-review documents submitted by Colabella and send each reviewed entity an acceptance letter notwithstanding NYSSCPA's valid comments regarding Colabella's work;[8] and (3) that with respect to the IK Engagement, (a) three of the outstanding issues presented to the Ad Hoc Committee were in fact sufficiently resolved by Colabella, (b) NYSSCPA's comments with respect to Colabella's work were valid as to one remaining item, and (c) "due to the lateness of [Colabella's] review and in

fairness to the reviewed firm," NYSSCPA should accept the peer-review documents submitted by Colabella and send IK an acceptance letter notwithstanding the NYSSCPA's valid comments regarding his work. (*Id.* ¶¶ 179-182, 184; Lieberum Letter at 1-2.) The Ad Hoc Committee did not make any findings regarding the grievances Colabella communicated to AICPA through his January 8, 2009 letter to Coffey. (Am. Compl. ¶¶ 174, 187.)

> 8   Colabella alleges that by recommending that his peer-review reports be accepted, the Ad Hoc Committee implicitly acknowledged that his work product conformed to AICPA standards. (Am. Compl. ¶ 183.) A September 2, 2008 letter from Susan [*18] Lieberum, writing on behalf of the AICPA PRP, makes clear, however, that AICPA directed NYSSCPA to accept Colabella's report—*notwithstanding the errors therein*—for the sake of the reviewed firm, and that he should be given feedback regarding the outstanding errors. (ECF No. 19, Affidavit of Virgil W. Webb ("Webb Aff."), Ex. 2, September 2, 2009 letter from Susan Lieberum ("Lieberum Letter").)

Colabella contends that the Ad Hoc Committee's conclusions were contrary to overwhelming evidence—including his detailed and professional responses—that he had timely responded to each of NYSSCPA's requests for changes to his work product such that there were no outstanding matters to address, and that he had indeed met the mandatory CPE requirements. (*Id.* ¶¶ 181, 185, 188.) He also alleges that the Ad Hoc Committee's findings were designed to create an appearance of compliance with AICPA's PRP procedures, while preventing him from exercising independence in conducting peer reviews under the auspices of AICPA and NYSSCPA, and discouraging others like him who might object to the "pettiness and impracticality in the administration" of the PRP. (*Id.* ¶¶ 190-192.)

As a result of the Peer Review Committee's [*19] issuance of notices to Colabella, delivery of final peer-review reports to his clients was unreasonably delayed, and the cost of his compliance with the technical review of his peer-review engagements was unreasonably and unnecessarily increased. (*Id.* ¶¶ 206.B-C.) Furthermore, following his suspension from conducting peer reviews for the PRP, Colabella was deprived of fees that he would have derived from future peer-review engagements performed under the auspices of AICPA and NYSSCPA. (*Id.* ¶ 206.E.) In addition, Colabella alleges that through the suspension, AICPA and NYSSCPA summarily deprived him, without due process, of his right to conduct future peer reviews. (*Id.* ¶ 224.)

John A. Demetrius peer-reviewed Colabella for the period ending April 30, 2009--which encompassed the FL&Z, DK&W, RMB, and IK Engagements--and on April 29, 2010, Demetrius opined that Colabella was fully compliant with the continuing education requirements of the AICPA, New York State, and Government Auditing Standards for the relevant period. (*Id.* ¶ 168.) Susan M. Rowley, a Senior Technical Manager of the AICPA PRP who supervised Demetrius' peer review, likewise concluded that Colabella was in compliance with [*20] AICPA's continuing education requirements. (*Id.* ¶ 169.)

### E. Antitrust Claims

Plaintiffs allege that the PRP constitutes a "virtual monopoly" in the market for peer review of CPAs in states such as New York where a "statutory peer review program" through which CPAs can undergo peer review is lacking. (Am. Compl. ¶ 195.) Regulations promulgated by various government agencies make peer review obligatory for CPAs who engage in specific types of work, including audits of: government entities and entities that receive government awards; FDIC-insured and Federally Insured Thrift institutions; publicly traded companies; and borrowers from the Rural Utility Service. Plaintiffs allege that all CPAs in New York State who perform such audits *must* be peer-reviewed through NYSSCPA under the AICPA's PRP (id. ¶¶ 52.A-E; 195), although the court notes that at least one other entity--the PCAOB--also conducts peer reviews of CPAs in this state.[9]

> 9   Although plaintiffs allege that peer reviews of CPAs in the State of New York are administered solely by AICPA through NYSSCPA (*see* Am. Compl. ¶ 113), the court does not accept this allegation as true for purposes of this motion because it is contradicted by other [*21] statements in the Amended Complaint, and as explained *supra*, the Court "need not feel constrained to accept as truth conflicting pleadings that make no sense . . . or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely." *In re Livent*, 151 F. Supp. 2d at 405. The Amended Complaint also states that CPAs in New York who are "not registered and supervised by the PCAOB" must submit to peer review conducted by AICPA through NYSSCPA. (Am. Compl. 114-18.) If CPAs in New York could only be peer-reviewed through the PRP administered by AICPA and NYSSCPA, the specific PCAOB-related allegations would be superfluous.

Plaintiffs allege that AICPA selectively and inconsistently applies its rules, thereby purging and excluding from its pool of approved peer reviewers those who truly seek to exercise independence and intellectual honesty, and restricting the performance of peer review to "those who accept the arbitrary and capricious administration of the Peer Review Program." (*Id.* ¶ 196.) Consequently, plaintiffs allege, AICPA and NYSSCPA restrain trade by restricting the class of peer reviewers for its PRP to those who are "favored" by personnel [*22] charged with administration of the PRP, and reducing competition among CPAs who want to be peer reviewers for AICPA and NYSSCPA. (*Id.* ¶¶ 196.D-E; 197.) Plaintiffs further allege that AICPA and NYSSCPA restrain trade among businesses required to engage CPAs by limiting the class of peer-reviewed CPAs available to conduct certain statutorily required audit services (e.g. auditing FDIC-insured institutions) to those who accept and abide by AICPA and NYSSCPA's inconsistent application of their own standards under the PRP. (*Id.* ¶ 198.A.)

## II. Procedural History

Plaintiffs initially brought this action against defendants on May 19, 2010. (*See* ECF No. 1, Complaint.) After defendants notified the court of their intention to file a motion to dismiss under Rule 12(b)(6) for failure to state a claim (*see* ECF No. 7, Letter from AICPA Requesting Pre-Motion Conference), plaintiffs filed an Amended Complaint on October 20, 2010, asserting claims identical to those in the Complaint. Shortly thereafter, defendants filed the instant motion to dismiss all claims pursuant to Rule 12(b)(6). (*See* ECF No. [*23] 17, Defendants' Motion to Dismiss.) Defendants have not yet filed an answer and discovery has not yet commenced.

## DISCUSSION

## I. Standard of Review

## A. Reviewing the Motion to Dismiss

A complaint may be dismissed under Federal Rule of Civil Procedure 12(b)(6) if a plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Therefore, in order to survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal quotation marks omitted)). Assessing the plausibility of claims set forth in a complaint is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ruston v.*

*Town Bd.*, 610 F.3d 55, 58-59 (2d Cir. 2010) (quoting *Iqbal*, 129 S.Ct. at 1950). In conducting such an assessment, a court must draw all inferences in favor of the non-movant. *Vietnam Ass'n*, 517 F.3d at 115 (quoting *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007)). However, allegations must [*24] consist of more than mere labels, legal conclusions, or a "formulaic recitation of the elements of a cause of action." *Arar v. Ashcroft*, 585 F.3d 559, 594 (2d Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1949). Moreover, bare legal conclusions unsupported by factual allegations are "not entitled to the assumption of truth." *Ruston*, 610 F.3d at 59 (citing *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010)).

## B. Consideration of Documents Outside the Amended Complaint

Because both parties submitted materials outside the pleadings in their moving papers, the court must determine whether to treat the instant motion as a motion to dismiss or convert it to one for summary judgment. *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) ("[w]hen matters outside the pleadings are presented in response to a Rule 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.") (internal quotations omitted). The district court has "complete discretion" to determine whether to convert the [*25] motion to dismiss into one for summary judgment. *Hoy v. Inc. Village of Bayville*, 765 F. Supp. 2d 158, 164 (E.D.N.Y. 2011) (citing *Carione v. United States*, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005)). Furthermore, summary judgment is generally inappropriate before the parties have had the opportunity to engage in discovery. *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 399 (S.D.N.Y. 2007); *compare United States v. City of New York*, 683 F. Supp. 2d 225, 245 (E.D.N.Y. 2005) (conversion to summary judgment deemed appropriate where there was a "highly developed record before the court" that contained years' worth of discovery materials because interrogatories and document requests had been exchanged, litigated, and answered; named defendants had been deposed; and experts on both sides had submitted reports and been deposed, such that neither side should be surprised by the court's decision to convert the motion), *with Kalin*, 526 F. Supp. 2d at 399 (declining to convert motion to dismiss where the issue raised--sufficiency of the pleadings--did not require discovery, and discovery was stayed pending motion to dismiss). The present case is still in its nascent stages; defendants have not yet [*26] filed an answer, and the parties have not engaged in discovery, which would significantly aid the court in rendering a

decision on a summary judgment motion. The court therefore finds that conversion of defendants' motion to dismiss is inappropriate and will decide defendants' motion pursuant to Rule 12(b)(6).

In deciding defendants' motion to dismiss, the court may properly consider facts alleged in the complaint, any exhibits attached to the complaint, and documents incorporated by reference in the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). Notably, "limited quotation" from a document does not render the document "incorporate[ed] by reference" into the complaint for purposes of a Rule 12(b)(6) motion. *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985). Even if a document is not incorporated by reference, however, the court may still consider it if the complaint "relies heavily upon its terms and effect," rendering the document "integral" to the complaint. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers*, 282 F.3d at 152-53). Contracts that underlie [*27] the claims brought in a suit are classic examples of documents that may be considered on a motion to dismiss even though the plaintiff does not physically attach them to the Amended Complaint. *Ackerman v. Local Union 363, Int'l Bhd. of Elec. Workers*, 423 F. Supp. 2d 125, 127 (S.D.N.Y. 2006).

In their moving brief, defendants attempt to introduce seven exhibits and an affidavit sworn to by the assistant general counsel of AICPA. (Defs.' Mem. at 1; Webb Aff. and attached Exhibits 1-7.) Likewise, in their opposition memorandum, plaintiffs attempt to introduce three exhibits and an affidavit sworn to by Colabella. (Pls.' Opp'n at 2; ECF No. 21-2, Affidavit of Patrick R. Colabella in Opposition ("Colabella Aff.") and attached Exhibits A-C.) Applying the standards set forth *supra*, the court will disregard all documents attached to the parties' motion papers except: (1) the Amended Complaint, attached as Exhibit 1 to the Webb Affidavit; and (2) the Lieberum Letter. The Lieberum Letter may be considered in deciding the present motion because plaintiffs referred to the letter and "relie[d] heavily on its terms and effect," *Mangiafico*, 471 F.3d at 398, in drafting their Amended Complaint. (*See* [*28] Am. Compl. ¶¶ 179-192) (discussing various aspects of the Lieberum Letter to support claim of defendants' unfair treatment of plaintiffs). Because the remaining documents submitted by the parties were not attached to the Amended Complaint, incorporated by reference, or so heavily relied upon as to render them integral to the Amended Complaint, the court excludes them from consideration for purposes of deciding the Rule 12(b)(6) motion to dismiss for failure to state a claim.

## II. Sufficiency of the Pleadings as to Section 1983 Claim

### A. Pleading Standard

In relevant part, 42 U.S.C. § 1983 ("Section 1983") provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 itself does not create any substantive rights; rather, it provides a procedural mechanism for redressing the deprivation of [*29] rights created by the Constitution or laws of the United States. _Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993)_ (citing _City of Oklahoma City v. Tuttle, 471 U.S. 808, 816, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)_). To state a cognizable claim under Section 1983, plaintiffs must allege that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." _Weiss v. Inc. Village of Sag Harbor, 762 F. Supp. 2d 560, 568 (E.D.N.Y. 2011)_ (quoting _Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999)_).

The Supreme Court, in _Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)_, established a two-prong test for determining when a private party's actions can be deemed to satisfy Section 1983's requirement that the challenged conduct was "under color of state law." Actions of a private party can be deemed "fairly attributable" to the state, and therefore treated as action taken "under color of state law," when (1) the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom [*30] the State is responsible," and (2) "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." _Hollander v. Copacabana Nightclub, 624 F.3d 30, 33 (2d Cir. 2010)_ (quoting _Lugar, 457 U.S. at 937_). A private party's actions may be attributable to the state under the second _Lugar_ prong if it meets one of three tests: (1) "The 'compulsion test': the entity acts pursuant to the 'coercive power' of the state or

is 'controlled' by the state"; (2) "The 'public function test': the entity 'has been delegated a public function by the [s]tate,'"; or (3) "The 'joint action test' or 'close nexus test': the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies." _Hollander, 624 F.3d at 34_ (quoting _Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008)_ (internal citations omitted)).

In addition, to state a cognizable Section 1983 claim, plaintiff must identify a constitutionally protected liberty or property interest of which he was deprived without due process. _See Narumanchi v. Bd. of Trs. of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988)_ [*31] ("whether the plaintiff has a property or liberty interest protected by the Constitution" is a threshold issue in analysis of Section 1983 claims).

### B. Application

### 1. State Actor Requirement

To adequately plead a Section 1983 claim, plaintiffs must allege that defendants acted under color of state law when they suspended Colabella from the practice of conducting peer reviews for CPAs under the auspices of AICPA and NYSSCPA. As plaintiffs' allegations fail to meet either _Lugar_ prong, they fail to plead the requisite state actor requirement.

### a. First _Lugar_ Prong

Applying the first _Lugar_ prong, plaintiffs fail to plead that the deprivation Colabella suffered--namely, his "right to conduct future peer reviews" (_see_ Am. Compl. ¶ 224)--resulted from the "exercise of a right or privilege having its source in state authority . . . ." _LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 432-33 (2d Cir. 1995)_ (quoting _Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 620, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991)_). In other words, plaintiffs must allege that AICPA and NYSSCPA acted with state-given authority when they revoked Colabella's approval to conduct peer reviews under their auspices. Plaintiffs purport to satisfy this prong by [*32] alleging that the State of New York relies on AICPA and NYSSCPA as the sole administrators of CPA peer reviews and as the state's "surrogate[s]" to "implement[] [its] policy . . . [regarding] the Peer Review process for Certified Public Accountants within the State." (Am. Compl. ¶¶ 113, 123.)

Besides the fact that AICPA and NYSSCPA are not the "sole administrators" of CPA peer reviews in New York State,[10] plaintiffs' allegation of the state's reliance on AICPA and NYSSCPA conflicts with their simultaneous assertion that the state recently demonstrated its

*bona fide* interest in regulating the peer review of public accountants by promulgating a statute providing for mandatory peer review of CPAs, beginning on January 1, 2012. (*Id.* ¶ 112.) The recency of the state's promulgation of this new law--one that has not yet even taken effect--to mandate and regulate, *for the first time*, the peer review of CPAs in New York, strongly implies that the state did not have a policy regarding the peer review of CPAs before.

> 10    As alleged in the Amended Complaint, PCAOB also conducts peer reviews, as discussed *supra*. (*See* Am. Compl. ¶¶ 114-18.)

Therefore, plaintiffs' allegations that AICPA and NYSSCPA were [*33] acting as "surrogates" of the state to "implement" a state policy that was heretofore non-existent are conclusory and not well-pleaded, and therefore not accepted as true for purposes of deciding this motion. While a court deciding a motion to dismiss must interpret the Amended Complaint liberally and draw all reasonable inferences in the non-movant's favor, *Chambers*, 282 F.3d at 152, the court "need not feel constrained to accept as truth conflicting pleadings that make no sense . . . or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely . . . ." *In re Livent*, 151 F. Supp. 2d at 405; *MMC Energy, Inc. v. Miller*, No. 08-CV-4353, 2009 U.S. Dist. LEXIS 83777, 2009 WL 2981914, at *7 (S.D.N.Y. Sept. 14, 2009) (dismissing claim where necessary supporting allegation was specifically contradicted by other portions of the complaint).

Plaintiffs also argue that they "satisfy the first prong [of *Lugar*] by . . . showing that Colabella was sanctioned on four separate occasions, by being precluded from the conduct of peer reviews, because of the actions taken by Defendants, AICPA and NYSSCPA, as an exercise of their disciplinary authority--this despite Colabella's [*34] certification and good standing as a CPA in New York State . . . ." (Pls.' Opp'n at 13.) This argument does not support plaintiffs' position, however, because the mere fact of Colabella's sanction does not satisfy the first *Lugar* prong as it fails to demonstrate, or even assert, that New York State created AICPA and NYSSCPA's right to sanction Colabella, or that such sanctioning was a "rule of conduct imposed by the State or by a person for whom the State is responsible." *Hollander*, 624 F.3d at 33 (quoting *Lugar*, 457 U.S. at 937). Therefore, the court finds that plaintiffs' Amended Complaint fails to satisfy the first *Lugar* prong.

**b. Second *Lugar* Prong**

Even assuming that plaintiffs satisfied the first *Lugar* prong by adequately pleading that AICPA and NYSSCPA were acting with authority from New York

State in administering the PRP, however, plaintiffs fail to allege facts that meet the second *Lugar* prong, as no well-pleaded facts in the Amended Complaint properly allege that defendants met the "compulsion," "public function," or "joint action/close nexus" tests outlined in *Sybalski*, 546 F.3d at 257.

**i. Compulsion Test**

Under the "compulsion test," a nominally private entity may be considered [*35] a state actor when the party acted pursuant to the coercive power of the state or was controlled by the state. *Sybalski*, 546 F.3d at 257 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001)). The "coercion" inquiry focuses on whether the challenged activity was "compelled or even influenced" by state regulation. *Husain v. Springer*, 193 F. Supp. 2d 664, 672 (E.D.N.Y. 2002) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 841, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982)). For example, in *Brentwood*, the Supreme Court noted that Amtrak, though nominally private, was considered a "state actor" for the purpose of determining if individual rights guaranteed by the Constitution were violated because Amtrak was created pursuant to a federal law to achieve governmental objectives, and the government retains authority to appoint the majority of Amtrak's directors; therefore, Amtrak could fairly be said to act under the compulsion of the state. *Brentwood*, 531 U.S. at 296 (citing *Lebron v. Nat'l R.R. Passengers Corp.*, 513 U.S. 374, 400, 115 S. Ct. 961, 130 L. Ed. 2d 902 (1995)). In contrast, in *Rendell-Baker*, the Supreme Court found that terminations of employment effected by a private school that (1) received ninety to ninety-nine [*36] percent of its funding from the state; (2) was subject to state regulation; and (3) contracted with the state to perform certain services for students, did not constitute "state action." 457 U.S. at 832-33. The Second Circuit explained in *Horvath v. Westport Library Ass'n* that the "decisive factor" in the Supreme Court's *Rendell-Baker* decision was that "the school's personnel decisions were uninfluenced by public officials and that 'the decisions to discharge the petitioners were not compelled or even influenced by any state regulation.'" 362 F.3d 147, 152 (2d Cir. 2004) (quoting *Rendell-Baker*, 457 U.S. at 841).

In the instant case, plaintiffs failed to allege facts that, if established, would show that defendants' suspension of Colabella was action compelled by the State of New York. Plaintiffs do not allege that AICPA, NYSSCPA, or their leaders act under the coercion or influence of the state, or that the state influenced or compelled defendants to suspend Colabella as a peer reviewer for AICPA and NYSSCPA. Nor do plaintiffs allege that the state has any role in choosing or directing

the leadership of AICPA and NYSSCPA. At most, plaintiffs contend that defendants acted as "surrogates" [*37] of the state (an assertion that would imply coercion), but the court does not accept that allegation for the reasons set forth *supra*.

### ii. Public Function Test

The "public function" test centers upon an inquiry of whether the challenged activity is one that is "traditionally exclusively reserved to the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974) (quoted in *Rendell-Baker*, 457 U.S. at 842). "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978). Activities that have met the "public function" test include those that are "traditionally associated with sovereignty, such as eminent domain . . . ." *Jackson*, 419 U.S. at 352; *see also Terry v. Adams*, 345 U.S. 461, 73 S. Ct. 809, 97 L. Ed. 1152 (1953) (election); *Marsh v. Alabama*, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946) (company town); *Evans v. Newton*, 382 U.S. 296, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966) (municipal park); *West v. Atkins*, 487 U.S. 42, 54-57, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988) (imprisonment of individuals as punishment for criminal activity); *Flagg Bros.*, 436 U.S. at 163 (citing education, fire and police protection, and tax collection as examples of exclusive "municipal functions").

Plaintiffs have [*38] not alleged that defendants' administration of peer reviews conducted under the auspices of AICPA and NYSSCPA is an activity that is "traditionally exclusively reserved to the State." Plaintiffs do assert that New York State's Board of Accountancy uses the Uniform CPA Examination in determining which public accountancy candidates should be licensed as CPAs, and that AICPA prepares and grades the examination. (*See* Am. Compl. ¶¶ 11.H-J., 110.) Even if AICPA and NYSSCPA were serving a "public function" by developing and grading the Uniform CPA Examination for use by the state's Board of Accountancy, that alone would be insufficient to confer "state actor" status for purposes of this analysis because preparation of the Uniform CPA Examination is not the activity complained of in the present action and plaintiff's status as a CPA has not been affected by defendants' challenged activities. For a private entity to be considered a state actor, "the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury." *Powe v. Miles*, 407 F.2d 73, 81 (2d Cir. 1968). In other words, "the state action, [*39] not the private action, must be the subject of complaint." *Id.* Here, the subject of plaintiffs' Amended Complaint does not meet the

"public function" test because defendants' administration of a peer-review program for CPAs--unlike elections, tax collection, and education--is not a function "traditionally exclusively reserved to the State."

### iii. Joint Action/Close Nexus Test

The "joint action/close nexus" test is met when the relationship between a private entity and the government is so "overborne by the pervasive entwinement of public institutions and public officials in its composition and workings" that actions of the private entity must be viewed as actions of the state. *Brentwood*, 531 U.S. at 298. Put another way, "[a] nexus of 'state action' exists between a private entity and the state when the state . . . is entwined in the management or control of the private actor, or provides the private actor with significant encouragement, either overt or covert . . . or is entwined with governmental policies." *Flagg v. Yonkers Savs. and Loan Ass'n, FA*, 396 F.3d 178, 187 (2d Cir. 2005) (quoting *Cranley v. Nat'l Life Ins. Co.*, 318 F.3d 105, 111 (2d Cir. 2003)).

Determination of whether specific [*40] conduct constitutes state action is a "'necessarily fact-bound inquiry.'" *Cranley*, 318 F.3d at 111-12 (quoting *Brentwood*, 531 U.S. at 298). Plaintiffs claim that a number of facts alleged in the Amended Complaint demonstrate the requisite entwinement between defendants and New York State, but the court is not persuaded that the proffered allegations satisfy the "joint action/close nexus" test. Plaintiffs claim, for instance, that AICPA's role in preparing and grading the Uniform CPA Examination, which is used by the State Board of Accounting (*see* Am. Compl. ¶¶ 11.H-J., 110), renders AICPA and NYSSCPA "entangle[d]" with the state. (Pls.' Opp'n at 15-16.) The state's use of professional assessments privately executed by a private entity does not automatically cloak the entity with the state's authority, however. In *Rohan v. Am. Bar Ass'n*, another court within this district determined that the American Bar Association ("ABA")--which, like AICPA and NYSSCPA, is a professional association--is not a state actor, even though admission to practice law in New York State requires graduation from an ABA-accredited law school, because "the State of New York has not explicitly delegated to the [*41] ABA its responsibility for setting the requirements that an individual must meet in order to be licensed as an attorney-at-law" and "any conferral of monopoly status on the ABA by New York State does not convert the ABA into a state actor." No. 93-CV-1338 (SJ), 1995 U.S. Dist. LEXIS 21944, 1995 WL 347035, at *5 (E.D.N.Y. May 31, 1995), *aff'd on other grounds*, 100 F.3d 945 (2d Cir. 1996); *see also Anderson v. La. Dental Ass'n*, 372 F. Supp. 837, 841-42 (M.D. La. 1974), *aff'd*, 502 F.2d 783 (5th Cir. 1974) (professional association

not liable as a state actor for denying plaintiff membership because practice of dentistry in the state is not contingent upon membership in association and "none of these purely private associations have any control whatsoever over the practice of dentistry in the [state]"). Similarly, plaintiff's ability to practice as a CPA is not contingent upon membership in the private defendant associations.

Plaintiffs' allegation that AICPA's promulgation of many standards used in GAAS, GAAP, and GAGAS (*see* Am. Compl. ¶¶ 12-16, 24-36) is evidence of entwinement between the state and AICPA and NYSSCPA (*see* Pls.' Opp'n at 15) also fails in light of the Supreme Court's recognition that a state's adoption [*42] of rules and standards promulgated by a private entity does not convert the private entity into a "state actor." *See Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 195, 109 S. Ct. 454, 102 L. Ed. 2d 469 (1988)* (private athletic association not a state actor even though state university adopted association's standards to govern its athletic activities). Furthermore, the court disagrees with plaintiffs' contention that entwinement with the state is evident from the tax-exempt status of AICPA and NYSSCPA, through which both entities receive substantial assistance from the State of New York. (Am. Compl. ¶¶ 124-26; Pls.' Opp'n at 16.) In *Blum v. Yaretsky*, the Supreme Court concluded that a "close nexus" did not exist between a private mental facility and the government--even though the state subsidized the cost of the facility, paid the expenses of the patients, and licensed the facility--because the state had no role in the complained-of activity, the discharge and transfer of patients without a hearing. *457 U.S. 991, 1004, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982)*. Here, plaintiffs do not allege the state's involvement or role in the events leading to Colabella's suspension as a peer reviewer for AICPA and NYSSCPA. Therefore, the mere fact that [*43] AICPA and NYSSCPA are tax-exempt, non-profit corporations is insufficient to demonstrate entwinement between defendants and the state.

Nor is the court persuaded by plaintiffs' claim that the state depends on AICPA for the peer review of CPAs who audit specific types of entities[11] because AICPA and NYSSCPA are--with the exception of PCAOB--the "sole source of accreditation" for CPAs who must fulfill a mandatory peer-review requirement. (Pls.' Opp'n at 14, 16; Am. Compl. ¶¶ 52, 114-18, 195.) Without more, plaintiffs' allegation fails to show a sufficiently close nexus between NYSSCPA and the state. The purpose of the close nexus test is "to assure that constitutional standards are invoked only when it can be said that the state is *responsible* for the specific conduct of which the plaintiff complains." *Blum, 457 U.S. at 1004* (emphasis in original).

11  Government entities and entities that receive government awards; FDIC-insured and Federally Insured Thrift institutions; publicly traded companies; and borrowers from the Rural Utility Service. (Am. Compl. ¶¶ 52.A-E.)

In *Brentwood*, the Supreme Court found that a nominally private athletic association in Tennessee was a "state actor" for purposes [*44] of a *Section 1983* action because the association was marked by "unmistakable" and "overwhelming" entwinement with the state: public school officials comprised the overwhelming majority of membership; those members elected representatives, all of whom were public officials at the time of the Court's decision; and the representatives promulgated the rules for which the association was challenged on constitutional grounds. *531 U.S. at 298-99, 302*. In addition, the Court observed that the state had "provided for entwinement from top down," assigning state board members *ex officio* to serve as members of the association's board of control and legislative council, and treating the association's ministerial employees as state employees in terms of eligibility for membership in the state retirement system. *Id. at 300*.

Plaintiffs have alleged no facts that begin to approach the level of entwinement found in *Brentwood*. Rather, plaintiffs' allegations more closely resemble those in *Flagg*, in which the Second Circuit affirmed the district court's finding that a private savings and loan association did not engage in "state action" when it refused to pay interest on the plaintiffs' escrow account [*45] because the association did not have a "close nexus" with the state. *396 F.3d at 187*. In so finding, the court noted that the association did not withhold interest due to a federal mandate or direction or advisement from a state agent; that the relevant government agency maintained a neutral position regarding the association's actions; and that the agency and association did not form a "joint enterprise." *Id.* In sum, the court observed, the association was a "private entity participating in a regulated field of activity," and no state action had occurred. *Id.*

Plaintiffs here have not alleged that the state encouraged or was responsible for AICPA and NYSSCPA's decision to suspend plaintiff from conducting peer reviews on behalf of those entities. Nor have plaintiffs alleged any facts to support a finding that the state was so entangled with AICPA and NYSSCPA such that any action taken by defendants should be considered state action. As such, the court finds that the allegations set forth in the Amended Complaint fail to satisfy the "joint action/close nexus" test.[12]

12   The court notes that plaintiffs' reliance on a five-factor test articulated by the Second Circuit in _Jackson v. Statler Found., 496 F.2d 623 (2d Cir. 1973),_ [*46] to support their claim that the Amended Complaint adequately alleges state action (see Pls.' Opp'n at 14) is misplaced. In _Statler,_ the Second Circuit laid out "five factors which are particularly important to a determination of 'state action': (1) the degree to which the 'private' organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a 'private' organization in associational or other constitutional terms." _496 F.2d at 629._ The Supreme Court later "tightened the proof required for a showing of state action," rendering the _Jackson_ analysis inapposite. _Fulani v. League of Women Voters Educ. Fund, 684 F. Supp. 1185, 1191 (S.D.N.Y. 1988); see also Blum, 457 U.S. at 1011_ (government may subsidize private entities without assuming constitutional responsibility for their actions); _Rendell-Baker, 457 U.S. at 842_ [*47] (private entity's performance of a function that serves the public does not make its acts governmental action); _Jackson, 419 U.S. at 350_ (extensive regulation by the government does not transform the actions of the regulated entity into those of the government)).

## 2. Deprivation Requirement

Plaintiffs' Section 1983 claim cannot survive a motion to dismiss for failure to state a claim because plaintiffs failed to allege facts sufficient to support a finding of state action. The court also finds that plaintiffs have not alleged a constitutionally protected property or liberty interest that would entitle them to due process protection. To meet the deprivation requirement of a Section 1983 claim, "[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." _Narumanchi, 850 F.2d at 72._ Only after that threshold is met must the court consider whether the deprivation was effected without due process. _Id._

Colabella alleges that defendants deprived him of "his right . . . to practice his profession as a peer reviewer" and the "substantial fees" that he would have earned by conducting peer reviews during the period following the date of [*48] his suspension, until present.

(Am. Compl. ¶¶ 219, 222, 224, 226-27.) The court notes that the Amended Complaint is unclear as to whether Colabella alleges deprivation of a property right or a liberty right, and the parties' briefs do not elucidate the matter: defendants frame the issue as one involving a liberty interest (see Defs.' Mem. at 17), while plaintiffs refer only to a "property right" (_see_ Pls.' Opp'n at 11). Although the court will analyze the alleged deprivation under both standards, its conclusion is the same: Plaintiffs have not alleged deprivation of a constitutionally protected interest.

### a. Deprivation of a Property Interest

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it" and "[h]e must have more than a unilateral expectation of it." _Clarry v. U.S., 85 F.3d 1041, 1046 (2d Cir. 1996)_ (quoting _Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972))._ "'[He] must, instead, have a legitimate claim of entitlement to it' under state or federal law in order to state a [Section] 1983 claim." _Seymour's Boatyard, Inc. v. Town of Huntington,_ No. 08-CV-3248, 2009 U.S. Dist. LEXIS 45450, 2009 WL 1514610, at *4 (June 1, 2009) (quoting _Finley v. Giacobbe, 79 F.3d 1285, 1296 (2d Cir. 1996))._ [*49] The Constitution does not create such entitlements; rather, entitlements are created and defined by "existing rules or understandings that stem from an independent source such as state law." _Harrington v. County of Suffolk, 607 F.3d 31, 34 (2d Cir. 2010)_ (quoting _Town of Castle Rock v. Gonzales, 545 U.S. 748, 756, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005))._ "When determining whether a plaintiff has a claim of entitlement, [the court] focus[es] on the applicable statute, contract or regulation that purports to establish the benefit." _Martz v. Inc. Village of Valley Stream, 22 F.3d 26, 30 (2d Cir. 1994)_ (citing _Kelly Kare, Ltd. v. O'Rourke, 930 F.2d 170, 175 (2d Cir. 1991), cert. denied, 502 U.S. 907, 112 S. Ct. 300, 116 L. Ed. 2d 244 (1991))._

In the Amended Complaint, Colabella claims a property interest primarily in "his right to practice his profession as a peer reviewer," and secondarily in the "substantial fees" he would have earned through such peer review. Plaintiffs do not cite to any "statute, contract, or regulation" that purportedly confers on Colabella the benefit at issue--the right to conduct peer reviews on behalf of AICPA and NYSSCPA. The court has also searched, without success, for any such statute or regulation that might have conferred [*50] upon Colabella a "legitimate claim of entitlement" to the right to conduct peer reviews. Accordingly, the court finds that Colabella's interest in practicing his profession as a peer reviewer for AICPA and NYSSCPA, and the fees he would have generated through that work, are outside the

scope of constitutional protections that may underlie a Section 1983 claim.

**b. Deprivation of a Liberty Interest**

It is well-settled that a person's freedom "to engage in any of the common occupations of life" is a liberty interest protected by the Fourteenth Amendment. *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 169 (E.D.N.Y. 2009) (quoting *Roth*, 408 U.S. at 572). Courts in the Second Circuit have consistently held, however, that "one must have no ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest." *Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 296 (S.D.N.Y. 1999) (citations omitted), *aff'd*, 225 F.3d 646 (2d Cir. 2000); *Thomas v. Held*, 941 F. Supp. 444, 450 (S.D.N.Y. 1996) (one's liberty interest in pursuing the occupation of his choosing is implicated only when action is "so damaging . . . that [it] would hinder seriously the employee from finding [*51] work in that field").

Plaintiffs do not claim that as a result of defendants' actions, Colabella has lost the ability to participate in the entire field of accounting, and they have not alleged that Colabella's suspension has had any effect on his ability to earn fees by performing work in the field of certified public accounting. Plaintiffs' well-pleaded allegations do not even state that Colabella has been hindered from pursuing work in the entire field of performing peer reviews for CPAs. As the Amended Complaint makes clear, PCAOB also conducts peer reviews (Am. Compl. ¶¶ 52.G., 114-18), and plaintiffs have not alleged that Colabella is unable to conduct peer reviews on behalf of PCAOB. Rather, plaintiffs allege only that Colabella is unable to perform further peer reviews on behalf of AICPA and NYSSCPA. Such pleadings fall short of demonstrating that defendants' actions implicated a cognizable liberty interest, and accordingly, the court grants defendants' motion to dismiss plaintiffs' Section 1983 claim for failure to state a claim.

**III. Sufficiency of the Pleadings as to Antitrust Claims**

**A. Antitrust Standing**

Plaintiffs assert two antitrust claims against defendants: a restraint-of-trade [*52] claim based on Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2 ("Section 1" and "Section 2," respectively), and a price-discrimination claim based on Sections 2 and 4 of the Clayton Act, 15 U.S.C. §§ 13, 15. The court begins its analysis of these claims by addressing defendants' claim that plaintiffs lack antitrust standing (*see* Defs.' Mem. 18).

It is well-settled that Plaintiffs who bring antitrust claims must have "antitrust standing" in addition to Article III standing. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (citing *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006)). To establish antitrust standing, a plaintiff must first show that he has suffered an antitrust injury, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)). In addition, a plaintiff must show that he is an "efficient enforcer" of the antitrust laws. *Id.* (citing *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988)). Determination of whether [*53] one is an "efficient enforcer" of the antitrust laws depends on the following factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Volvo*, 857 F.2d at 66 (citing *Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 540-45, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)).

Plaintiffs allege that AICPA and NYSSCPA "acted in combination and in conspiracy to administer the [PRP] in restraint of trade" by administering the PRP in a manner that contradicts its own published and advertised standards and guidelines, and by excluding from its ranks of peer reviewers those who, like Colabella, "place their independence and intellectual honesty above the dictates of . . . [defendants'] inconsistent application and enforcement" of the PRP standards and rules. (Am. Compl. ¶¶ 196.A-E, 198.A-B., 230.) Plaintiffs allege that AICPA and NYSSCPA so acted with [*54] the intent of restraining competition "between and among otherwise competent peer reviewers in the State of New York, and elsewhere, so as to limit the number of peer reviewers and control the number of firms actually conducting peer reviews." (*Id.* ¶ 243.)

Plaintiffs claim that three antitrust injuries have resulted from defendants' acts in violation of antitrust laws: (1) deprivation of fees that Colabella otherwise would have earned by conducting peer reviews but for defen-

dants' suspension, which resulted from their "arbitrary and capricious" administration of the PRP; (2) deprivation of Colabella's right to compete for peer review engagements, a deprivation shared by other CPAs who may likewise be arbitrarily and capriciously suspended from AICPA's program; and (3) deprivation to members of the general public who might need services of peer-reviewed CPAs of their "right and ability to secure competent, independent, peer reviewed" CPAs. (Am. Compl. ¶¶ 232, 236-41.)

## 1. Antitrust Injury

As an initial step in alleging antitrust injury, a plaintiff must "identify[] the practice complained of and the reasons such a practice is or might be anticompetitive." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 122 (2d Cir. 2007). [*55] To meet that requirement, the plaintiff must show "that the challenged action has had an actual adverse effect on competition as a whole in the relevant market . . . ." *George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) (quoting *Capital Imaging v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993) (emphasis in original)).

Plaintiffs fail to allege an anticompetitive practice that affects "competition as a whole in the relevant market," however. *George Haug Co.*, 148 F.3d at 139. The practice of which plaintiffs complain is defendants' administration of the PRP in a manner that removes from the pool of AICPA and NYSSCPA peer reviewers otherwise-competent peer reviewers who insist on exercising independence and resist bending to the arbitrary whims of the PRP administrators. (Am. Compl. ¶¶ 196.E, 197-98.) Plaintiffs allege that this practice harms competition in the overall market for peer review by "restrict[ing] the class of peer reviews to those who are 'favored' by those charged with the administration of the Peer Review Program . . . thereby reducing competition for no purpose other than to monopolize and control the administration of the [*56] Peer Review Program by those charged with [its] administration . . . ." (Am. Compl. ¶ 197.)

Apart from allegations that Colabella himself has suffered a loss by being suspended from conducting peer reviews for AICPA and NYSSCPA, the Amended Complaint is devoid of any other well-pleaded facts that support his contention that competition has been reduced. Without more, plaintiffs fail to demonstrate any antitrust injury, because "[a]lleging injury as an individual competitor within the market does not suffice to state a claim for an antitrust injury as antitrust statutes were enacted to protect competition and not individual competitors." *Wolf Concept S.A.R.L. v. Eber Bros. Wine and Liquor Corp.*, 736 F. Supp. 2d 661, 669 (W.D.N.Y. 2010); *see*

*also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.")

Moreover, plaintiffs have failed to even allege injury to themselves as individual competitors in the market for peer review: as discussed *supra*, [*57] the Amended Complaint does not allege that because Colabella cannot conduct peer reviews on behalf of AICPA and NYSSCPA, he cannot conduct peer reviews on behalf of *any* entity. Plaintiffs have not alleged that Colabella's suspension from conducting peer review on behalf of AICPA and NYSSCPA has any bearing on his ability to conduct peer reviews on behalf of PCAOB, for example. For these reasons, the court finds that plaintiffs have not pleaded facts sufficient to show an antitrust injury. Plaintiffs therefore lack antitrust standing to bring their claims under the Sherman and Clayton Acts, and the court need not analyze the "efficient enforcer" factors. Even assuming that plaintiffs did have antitrust standing, however, as discussed *infra*, plaintiffs' claims under the Sherman and Clayton Acts would nevertheless fail under Rule 12(b)(6).

## 2. Pleading Standards for Sherman Act Claims

### a. Section 1 Claim

Under Section 1 of the Sherman Act, every contract, combination, or conspiracy "in restraint of trade or commerce among the several States" is illegal. 15 U.S.C. § 1. This court recently recognized in *LaFlamme v. Societe Air France*, that "[b]ecause Section 1 of the Sherman Act does not prohibit [*58] all restraints of trade, but rather only *agreements* to restrain trade, '[t]he crucial question in a Section 1 case is therefore whether the challenged conduct stem[s] from independent decision or from an agreement, tacit or express.'" 702 F. Supp. 2d 136, 146 (E.D.N.Y. 2010) (Matsumoto, J.) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)). Allegations of parallel conduct or "specific allegations of actual agreement among defendants" may be sufficient to state such an agreement, *LaFlamme*, 702 F. Supp. 2d at 146 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 564-565 n.10 (2007)), but "'a few stray statements speak[ing] directly of agreement . . . are merely legal conclusions resting on . . . prior allegations,' and cannot be accepted as true." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 333 (D.Vt. 2010) (quoting *Twombly*, 550 U.S. at 564)).

### b. Section 2 Claim

Section 2 of the Sherman Act prohibits monopolization of "any part of the trade or commerce among the several States." 15 U.S.C. § 2. To state a monopolization claim under Section 2 of the Sherman Act, one must establish "(1) the possession of monopoly power in the relevant market and (2) the [*59] willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)).

### 3. Application

#### a. Section 1 Claim

An "agreement, tacit or express," is central to a Section 1 claim. *Starr*, 592 F.3d at 321 (quoting *Theatre Enters. Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540, 74 S. Ct. 257, 98 L. Ed. 273 (1954)). Although plaintiffs assert that AICPA and NYSSCPA "acted in combination and in conspiracy to administer the Peer Review Program in restraint of trade" (Am. Compl. ¶ 230), they fail to state any specific facts to elevate the bald assertion to a "plausible claim for relief." *See Iqbal*, 129 S.Ct. at 1950.

Plaintiffs contend, for example, that NYSSCPA's Peer Review Committee unjustifiably issued notices to Colabella based on erroneous claims that his work in specific engagements did not conform to the PRP's standards, and that the issuance of multiple notices led to his suspension from the PRP. (Am. Compl. ¶¶ 147-56.) Plaintiffs further allege that when Colabella [*60] appealed to AICPA about his alleged mistreatment leading to NYSSCPA's suspension, AICPA's Ad Hoc Committee rubber-stamped NYSSCPA's decision to "create the appearance of propriety" of NYSSCPA's actions. (Am. Compl. ¶¶ 174-90.) Such facts, without more, do not give rise to a plausible inference of conspiracy. In *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, the district court dismissed plaintiffs' Section 1 claim because the complaint contained nothing more than "the naked conclusion that the . . . Defendants have 'agreed with each other' not to deal with Plaintiff." 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009), *aff'd*, 391 Fed. App'x 59 (2d Cir. 2010). The court observed that the complaint offered no facts that would indicate the existence of an illegal agreement, such as "when the alleged conspiracy began, where it occurred, or what statements the . . . [d]efendants made to one another." *Id.* Similarly, in the instant case, plaintiffs have pleaded no more than a "[t]hreadbare recital[] of the elements" of a Section 1 claim. *Iqbal*, 129 S.Ct. at 1949-50 (citing *Twombly*, 550

U.S. at 555). Because "a conclusory allegation of agreement at some unidentified point does not supply facts adequate [*61] to show illegality [under Section 1]," *Twombly*, 550 U.S. at 557, defendants' motion to dismiss the Section 1 claim under Rule 12(b)(6) is granted.

#### b. Section 2 Claim

"Monopoly power, or 'the power to control prices or exclude competition,'" is a "central element" of a Section 2 claim. *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 398 (E.D.N.Y. 2008) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S. Ct. 994, 100 L. Ed. 1264 (1956)). Plaintiffs allege that a wide swath of CPAs must be peer-reviewed because they conduct certain types of audits, and only one other entity (PCAOB) conducts peer reviews. (Am. Compl. ¶¶ 52.A-G., 114-18.) Apart from those assertions, however, plaintiffs provide no further allegations to support their conclusion that AICPA and NYSSCPA have "monopolized the market for Peer Review of Certified Public Accountants" in the United States and in New York State. (Am. Compl. ¶ 234.) Hence, plaintiffs' allegations fall short of the required showings, either directly through "evidence of the control of prices or exclusion of competition" or indirectly, through evidence that "the defendant has a large percentage share of the [*62] relevant market." In re Payment Card, 562 F. Supp. 2d at 399 (quoting *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006)). Furthermore, plaintiffs leave utterly unaddressed the second required showing for a Section 2 claim--that defendants willfully acquired or maintained their monopoly power, versus growing or developing it due to a superior product, business acumen, or historic accident. *See PepsiCo*, 315 F.3d at 105. Therefore, defendants' motion to dismiss the Section 2 claim under Rule 12(b)(6) is granted.

### 4. Pleading Standard for Robinson-Patman Claim

Plaintiffs bring a claim under Section 2 of the Clayton Act, 15 U.S.C. § 13 (as amended by the Robinson-Patman Act of 1936 and hereafter referred to as the "Robinson-Patman Act"), and its enforcement provision, 15 U.S.C. § 15, which provides for treble damages. The Robinson-Patman Act proscribes price discrimination "between different purchasers of commodities of like grade and quality" where, as a consequence of such discrimination, competition is substantially lessened, injured, destroyed, or prevented; or a monopoly is created. 15 U.S.C. § 13(a). It is well-settled that the Robinson-Patman Act applies only to [*63] transactions involving "commodities," a term that courts have "strictly construed" to denote only "tangible products of trade." *Innomed Labs. v. ALZA Corp.*, 368 F.3d 148, 156 (2d

Cir. 2004) (citing *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir. 1980) (internal quotation marks omitted)). Unlike commodities, "intangible goods and services" are not subject to the Robinson-Patman Act. *Nat'l Comm'ns Ass'n v. Am. Tel. & Tel. Co.*, 808 F. Supp. 1131, 1136 (S.D.N.Y. 1992), *rev'd on other grounds*, 46 F.3d 220 (2d Cir. 1995); *see also Innomed Labs.*, 368 F.3d at 156 ("The Robinson-Patman Act's prohibition on price discrimination extends only to transactions involving 'commodities,'" and not "intangible rights or services"); *Gordon v. New York Stock Exch., Inc.* 366 F. Supp. 1261, 1263 (S.D.N.Y. 1973) ("The authorities are clear that services and intangibles . . . are not 'commodities' within the meaning of the [Robinson-Patman] Act.") (citing *Columbia Broad. Sys. v. Amana Refrigeration*, 295 F.2d 375 (7th Cir. 1961)).

**5. Application**

Plaintiffs concede, and the court agrees, that the peer review of accounting practices constitutes a service and not a commodity. (Pls.' Opp'n at [*64] 22.) Therefore, peer review of accounting practices is not subject to the price discrimination provisions of the Robinson-Patman Act. Plaintiffs nevertheless attempt to analogize their peer-review engagements to the process of newspaper production, which the Eighth Circuit held was a "commodity" within the meaning of the Act in *Morning Pioneer v. Bismarck Tribune Co.* because, notwithstanding the extensive services involved in producing the paper, it is "predominantly a tangible good" that "takes on a tangible form and [] is bought and sold in the market place." (Pls.' Opp'n at 22 (citing *Morning Pioneer*, 493 F.2d 383, 389 n.11 (8th Cir. 1974)). Plaintiffs claim that the peer-review reports that they draft as a result of their peer-review engagements are, like the newspapers described in *Morning Pioneer*, bought and sold in the market for peer review, and therefore "commodities" governed by the Robinson-Patman Act. (Pls.' Opp'n at 22.)

The Second Circuit recognizes the "dominant nature" or "dominant purpose" test employed in *Morning Pioneer* as a means to determine whether subjects that combine both tangible goods and intangible services are "commodities" for purposes of the Robinson-Patman [*65] Act. *See Innomed Labs.*, 368 F.3d at 156 (citing *Tri-State Broad. Co., Inc. v. United Press Int'l, Inc.*, 369 F.2d 268, 270 (5th Cir. 1966)). Employing that test here, however, the court finds that the dominant purpose of peer review among CPAs is not the procurement of a report containing the peer review results; rather, the primary purpose is to be evaluated by others in the same field to maintain and enhance the quality of work performed in the field. (*See* Am. Compl. ¶ 48.) Although peer-reviews do result in a tangible report, they are not "bought and sold in the market place," *Morning Pioneer*,

493 F.2d at 389 n.11. Therefore, the facts as alleged in the Amended Complaint do not state a claim under the Robinson-Patman Act, and defendants' motion to dismiss plaintiffs' price-discrimination claim for failure to state a claim is granted.

**IV.  Remaining Claims: Declaratory Judgment and State Law Claims**

**A. Declaratory Judgment Claim**

Plaintiffs request declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. The Declaratory Judgment Act, however, provides only a federal remedy, not a federal claim, so it can only be applied in cases in which there is an independent [*66] basis for the exercise of federal subject matter jurisdiction. *See Goldberg v. Cablevision Sys. Corp.*, 281 F. Supp. 2d 595, 604 (E.D.N.Y. 2003) ("As all the federal claims must be dismissed, the Court lacks jurisdiction to grant relief pursuant to the Declaratory Judgment Act.") Here, all of Plaintiff's federal claims are dismissed for failure to state a claim, and no substantive federal claim remains upon which plaintiffs can base their request for declaratory relief.

In addition, the purpose of declaratory relief is "to . . . settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." *Beacon Constr. Co., Inc. v. Matco Elec. Co., Inc.*, 521 F.2d 392, 397 (2d Cir. 1975) (quoting *Aetna Casualty & Surety Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)); *see also* 28 U.S.C. § 2201(a) (Declaratory Judgment Act provides that a federal court "may declare the *rights and other legal relations* of any interested party seeking such declaration . . . .") (emphasis added). Plaintiffs' request that this court declare, *inter alia*, that "[Colabella] is fit to be engaged to perform peer reviews in [*67] the State of New York and elsewhere," is not within the purview of the Declaratory Judgment Act, as an evaluation of Colabella's fitness to perform peer review for fellow CPAs does not involve an adjudication of legal rights or relations. Therefore, the declaratory judgment claim is dismissed.

**B. State Law Claims**

Finally, the court respectfully declines to exercise jurisdiction over plaintiffs' state law claims. Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." Because the court has dismissed plaintiff's federal claims, the court will decline to exercise jurisdiction over plaintiff's state law claims.

## CONCLUSION

For the reasons explained above, the plaintiffs' claims are dismissed in their entirety with prejudice. Plaintiff has had two opportunities to assert sufficient allegations, most recently in the Amended Complaint with 281 paragraphs, some of which contain subparagraphs. Accordingly, the Clerk is respectfully requested to enter judgment in favor of defendants and close the case.

**SO ORDERED**.

Dated: September 28, 2011

Brooklyn, New York

Kiyo A. Matsumoto [*68]

United States District Judge

LEXSEE



Caution
As of: Feb 17, 2012

**DOLORES DE LA CRUZ and ROSEMARY VEGA on behalf of themselves and all others similarly situated, Plaintiffs, v. GILL CORN FARMS, INC. and JOHN H. GILL, Defendants.**

**03-CV-1133**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

**2005 U.S. Dist. LEXIS 44675**

**January 25, 2005, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by, Claim dismissed by De La Cruz v. Gill Corn Farms, Inc., 2005 U.S. Dist. LEXIS 44676 (N.D.N.Y, Apr. 13, 2005)

**CORE TERMS:** class members, class action, notice, overtime, Labor Law, housing, opt-in, certification, liquidated damages, farm, agriculture, migrant, corn, opt-out, class certification, proposed class, packing, farm workers, injunctive relief, commonality, typicality, secondary, waive, oral argument, declaratory relief, experienced, numerosity, non-exempt, dispersed, seasonal

**COUNSEL:** [*1] For Dolores De La Cruz, on behalf of herself and all others similarly situated, Plaintiff: Paul L. Leclair, LEAD ATTORNEY, Wolford, Leclair Law Firm, Rochester, NY; Anita C. Butera, Farmworker Legal Services of New York - Rochester Office, Rochester, NY.

For Rosemary Vega, on behalf of herself and all others similarly situated, Plaintiff: Paul L. Leclair, LEAD ATTORNEY, Wolford, Leclair Law Firm, Rochester, NY.

For Jose F. Alvarez, Salvador Padilla, Rosa Padilla, Plaintiffs: Anita C. Butera, Farmworker Legal Services of New York - Rochester Office, Rochester, NY.

For Gill Corn Farms, Inc., John H. Gill, Defendants: Beatrice E. Havranek, LEAD ATTORNEY, Office of Beatrice E. Havranek, Rosendale, NY; Christine M. Cooper, Monte B. Lake, Natalie K. Brouwer, LEAD

ATTORNEYS, McGuiness, Norris Law Firm, Washington, DC.

**JUDGES:** Thomas J. McAvoy, Senior, U.S. District Judge.

**OPINION BY:** Thomas J. McAvoy

**OPINION**

**DECISION and ORDER**

**I. INTRODUCTION**

Plaintiffs commenced the instant action alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, the Migrant and Seasonal Agricultural Workers Protection Act ("AWPA"), 29 U.S.C. § 1801, et seq., [*2] New York Labor Law § 681 (overtime), and New York Real Property Law § 235-b (warranty of habitability), arising out of their work for Defendant Gill Corn Farms, Inc. ("Gill"). Currently before the Court is Plaintiffs' motion seeking to proceed as a class. Defendants oppose.

Plaintiff Delores De La Cruz was employed by Gill between July 2002 and October 2002. Plaintiff Lidia Alvarez worked for Gill between July 2003 and August 2003. During their employment, Plaintiffs regularly packed corn.

FLSA and New York Labor Law Factual Allegations

Plaintiffs allege that they often worked in excess of forty hours per week, but were not paid overtime wages at a rate of one and one half times their regular rate. The resolution of this issue will turn on whether the work performed by Plaintiffs falls within the FLSA's overtime exemption for farming.

AWPA Factual Allegations

Plaintiffs contend that, when they were recruited for employment, Gill gave them false and misleading information concerning the terms and conditions of their employment. It is further alleged that Gill failed to pay wages when due (the overtime payments), failed to provide proper pay information [*3] to Plaintiffs, and failed to keep proper payroll records. Plaintiffs also allege that Defendants violated the AWPA with respect to the conditions of the housing in which they resided (which is discussed below in connection with the warranty of habitability claim), and by failing to post certain legally required notices.

Factual Allegations Concerning Housing Conditions

During the time they worked for Gill, Plaintiffs resided in migrant farmworker housing provided by Gill. It is claimed that the housing failed to comply with the applicable minimum guidelines and standards. Plaintiffs' Complaint alleges that Defendants failed to correct housing violations identified by government inspectors and that the housing was overcrowded, lacked hot water, contained mattresses in poor condition, and had insufficient lighting, unsanitary restrooms, inadequate drainage, and windows in disrepair.

II. DISCUSSION

Plaintiffs move pursuant to Fed. R. Civ. P. 23 for the certification of several different classes. They seek to certify: (1) with respect to the AWPA and New York Real Property Law claims, the class of all migrant or seasonal farm workers employed by Defendants between [*4] 1997 and the present, and all individuals who resided in housing provided by Defendants for migrant agricultural workers between 1997 and the present; (2) with respect to the New York Labor Law claim, "all employees of Defendants who did not work in agriculture or secondary agriculture as defined by the FLSA and its implementing regulations;" and (3) with respect to the claims for injunctive relief, "all migrant and seasonal agricultural workers who have been employed, are currently employed, or will be employed by Defendants at Defendants' operations." Defendants object to class certification. The Court has now allowed the parties an opportunity to be heard on the issue of whether class certification is appropriate. In addition to briefing the issues before the Court, the parties appeared for oral argument

in Albany, New York on November 9, 2004. At that time, the Court reserved decision on the pending motion.

Before proceeding, the Court identifies two types of claims presented by Plaintiffs under the AWPA - one concerning the payment of wages and one concerning housing conditions and notices. The Court will address each of these claims separately.

a. NYCPLR 901

Defendants [*5] contend that N.Y.C.P.L.R. § 901(b) is a bar to class certification of the New York Labor Law claim because Plaintiffs are seeking liquidated damages. Section 901(b) provides that "[u]nless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action." Generally speaking, section 901 precludes the recovery of statutory penalties in a class action. It has been held that claims for overtime under the New York Labor Law may not be maintained as a class action where there is a demand for liquidated damages. In Ballard v. Community Home Care Referral Service, Inc., 264 A.D.2d 747, 695 N.Y.S.2d 130 132 (2d Dep't 1999), it was held that "[t]he fact that the plaintiff's complaint contains a claim for liquidated damages precludes class action relief." Here, Plaintiffs' Amended Complaint contains a claim for liquidated damages under the Labor Law and, thus, class action relief is precluded pursuant to § 901. To overcome this, the named Plaintiffs will have to agree to waive any [*6] claim for liquidated damages as a condition precedent to achieving class status. Of course, this is something counsel will have to discuss with Plaintiffs in the first instance.

Because of section 901, to participate in the class, the class members also would have to waive their right to seek liquidated damages under New York's Labor Law. Thus, any notices to proposed class members would have to advise that, if they wish to seek liquidated damages under the Labor Law, they will have to opt-out of the class action. See Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 95 (S.D.N.Y. 2001); Pesantez v. Boyle Environmental Services, Inc., 251 A.D.2d 11, 673 N.Y.S.2d 659, 660 (1st Dep't 1998). With respect to the proposed class members, however, the Court feels that their rights are not adequately protected by employing a class procedure whereby they will automatically waive their right to pursue liquidated damages by failing to opt out. In other words, this Court does not believe that someone's rights should be waived by inaction; that is, by doing nothing. We must not ignore the realities of class actions. Most people do not read, let alone understand, class action [*7] notices they receive in the mail.

Page 2

This is particularly so in this case where we are dealing with impoverished, migrant farm workers who likely do not understand English very well, who likely do not have a firm understanding of our legal system, and many of whom are likely to not receive actual notice of the class because they are geographically dispersed in unknown locations, and may not read the widely-dispersed, English-based newspapers. [1] The issue is even more complicated if there are conditions in the notice about waiving statutory penalties - subjects about which the recipients of any class notice are likely to know nothing about, let alone understand. The Court finds it hard to believe that the proposed class members would be knowingly and voluntarily relinquishing their rights to seek liquidated damages by failing to opt-out of a New York Labor Law class action. Yet, that is exactly what would happen if the Court were to permit the Labor Law claims to proceed as a class claim. For this reason and for additional reasons to be discussed later on, the motion to certify the New York Labor Law claim must be denied.

> 1    Plaintiffs' counsel represented at oral argument that most of the proposed class members are able to read, but many do not speak English, many do not speak English very well, they are dispersed throughout the United States of America and Mexico, and they do not have a working knowledge of our legal system. Plaintiffs' counsel also represented that, as of the date of oral argument, they have had little to no success locating any potential class members.

**[*8] b. Prerequisites to a Class Action**

The Court will now address the general requirements for class certification. Federal Rule of Civil Procedure 23(a) requires that the following conditions be met as a prerequisite to a class action: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

**1. Numerosity**

The first element is that the class is so numerous that joinder of all members is impracticable. This is known as the "numerosity" requirement. The Complaint alleges that there were 45-50 individuals working in the packing sheds in each of the years 2002-2003 and that at least 100 people lived in Defendants' farm labor housing. Defendants do not dispute this. Joining so many people would be impracticable and there is no evidence to the contrary. See Consolidated Rail Corp. v Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (Noting that nu-

merosity is presumed at [*9] 40). Accordingly, the numerosity requirement is met under the circumstances of this case.

**2. Typicality/Commonality**

The second and third elements are known as "commonality" and "typicality" respectively. Commonality requires that there be questions of law or fact common to the class. Marisol A v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997). Typicality requires that "the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Marisol A., 126 F.3d at 376 (internal quotations and citation omitted). These elements often are merged. see Marisol A., 126 F.3d at 376.

The Court finds that there are common questions of law and/or fact and that Plaintiffs claims appear to be typical of the proposed class. One such common issue concerns the nature of the agreement between Defendants and Paul Farms and the legal impact of that agreement. More specifically, there is the fundamental question of whether the corn packing work performed by Plaintiffs [*10] falls within an overtime exception under the FLSA. This is an issue that will necessarily impact all members of a properly defined class. The overtime-related claims of the class representatives are likely to be typical of the proposed class. The Plaintiffs' and the class members claims appear to arise out of the same course of events (the packing of corn grown on land owned by other farms) and similar legal arguments are likely to be made to prove or disprove Defendants' liability.

Plaintiffs also claim violations with the AWPA concerning Defendants' alleged failure to post certain required information. Ms. Alvarez's reply affidavit does state that she did not see any safety posters in the packing shed. Plaintiffs have failed to specify how or why the absence of such posters violates the AWPA. The Court is not, however, presented with a motion to dismiss or a motion for summary judgment and must accept the Complaint allegations as true for purposes of the instant motion. Shelter Realty Corp. v. Allied Maintenance Corp., 574 F.2d 656, 661 n.15 (2d Cir. 1978). The Amended Complaint together with the Alvarez affidavit provides some factual basis for finding that there [*11] was a condition present (a lack of proper notices) that likely was experienced by all proposed class members, thereby satisfying the commonality and typicality requirement as to the AWPA notice claim.

Another common issue will concern whether the housing provided met the minimum standards. Although the Court understands that there were twelve separate buildings involved, the Complaint alleges that the hous-

ing in general failed to meet minimum standards. While there may be some differing factual inquiries among the various houses, the condition of the housing in relation to the applicable standards is going to be common to all proposed class members. Moreover, based on the allegations in the Complaint, it appears that the conditions experienced by the class representative was typical of the conditions experienced by the proposed class members.

In sum, the Court finds that the commonality and typicality elements are satisfied.

### 3. Fair Representation

The fourth and final element is whether the representative parties will fairly and adequately protect the interests of the class. Rule 23(a)(4) requires that plaintiffs demonstrate that class counsel is qualified, experienced, [*12] and generally able to conduct the litigation. Marisol A., 126 F.3d at 378 (internal citations and quotations omitted). Plaintiffs must also demonstrate that there is no conflict of interest between the named plaintiffs and other members of the plaintiff class.

Upon reviewing the qualifications of Plaintiffs' counsel and their experience, the Court has little doubt that they are qualified to represent a class. Although lead counsel, Attorney Leclair, has never been involved in a class action, he does have significant experience in federal court, in litigating complex matters, and in handling wage claims.

The Court also does not find any conflict of interest between the named plaintiffs and other members of the proposed class. The fact that Ms. Alvarez has a workers' compensation claim against Defendant does not suggest any conflict of interest with other potential class members.

For the foregoing reasons, the Court finds that Plaintiffs have satisfied Fed. R. Civ. P. 23(a) as to the overtime-related and notice claims.

### c. Whether a Class Action is Maintainable

Once the prerequisites of Rule 23(a) are satisfied, plaintiffs seeking to maintain a class action [*13] must also satisfy one of the three subsections of Rule 23(b). Here, Plaintiffs have opted to proceed under Rule 23(b)(2), which provides that "[a]n action may be maintained as a class action if . . . the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

The Second Circuit has explained that:

> When considering a motion for Rule 23(b)(2) certification of a claim seeking both injunctive relief and non-incidental monetary damages, a district court must consider the evidence presented at a class certification hearing and the arguments of counsel, and then assess whether (b)(2) certification is appropriate in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case. . . . [W]hen making an ad hoc determination, a district court should, at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive [*14] or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery.

Parker v. Time Warner Entertainment Co., 331 F.3d 13, 19-20 (2d Cir. 2003) (internal quotations, citations and alterations omitted).

The Court has concerns whether Plaintiffs meet the requirement of Rule 23(b)(2). The Complaint primarily seeks damages in the form of overtime payments and statutory damages for violations of the AWPA. Although Plaintiffs are seeking a "declaration" that they were engaged in non-exempt work, the effect of this declaration "simply is to lay the basis for a damage award rather than injunctive relief." 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1775 at 463 (2d ed. 1986). Similarly, while the Complaint does seek to permanently enjoin Defendants from violating the AWPA, the FLSA, the New York Labor Law, and the New York Real Property Law, the relief requested is overbroad and, therefore, unworkable. The Court cannot, [*15] and will not, issue such an injunction. Further, if Plaintiffs are found to have engaged in non-exempt work, there is no indication in the record that an injunction would be required going forward. In sum, the Court is not persuaded that Plaintiffs would have brought this action seeking only declaratory or injunctive relief or that injunctive or declaratory relief would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. See Saur v. Snappy Apple Farms, Inc., 203 F.R.D. 281, 286 (W.D. Mich. 2001). The Court must, therefore, consider whether certification is appropriate under 23(b)(3).

In adjudicating the appropriateness of certification under Rule 23(b)(3), the following factors are taken into consideration: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class [*16] action.

There is little to no interest of potential class members in individually controlling the prosecution or defense of separate actions. There also is no indication of any litigation concerning this issue that has already been commenced by potential class members. Because all pertinent events are alleged to have taken place in the Northern District of New York, it is desirable to concentrate the litigation in this forum. Thus, the first three factors all point towards certification. The fourth factor is, however, much more troubling.

There undoubtedly will be significant issues in managing the proposed classes including finding potential class members and allocating damages. One problem is in providing notice to the proposed class members. "No principle is more fundamental to our system of judicial administration than that a person is entitled to notice before adverse judicial action is taken [with respect to] him." Lugo v. Keane, 15 F.3d 29, 30 (2d Cir. 1994). The class consists of migrant farm workers. It appears that these people do not have permanent addresses, likely do not speak English or, alternatively, English is not their primarily language, and [*17] likely do not read major newspapers. [2] Although Plaintiffs have indicated some of efforts they will undertake to reasonably apprise the class members of this action, the Court is unconvinced of its likely success. The reasons are as follows.

2 See supra n. 1.

On May 24, 2004, this Court previously granted a motion for preliminary certification of the FLSA class claims. Under that prior order, the Court allowed for a 270 day opt-in period. As of the date of oral argument, November 8, 2004, 168 days into the 270 opt-in period, [3] not one potential class member has responded to the class notice. This causes the Court to have serious doubts whether the potential class members are receiving the notice in the first instance or, assuming they are receiving the notice, that they are reading it and/or understanding it. The Court has significant concern that many of the potential class members' rights would be adjudicated without their having any idea as to what was going on, that they might be entitled to some [*18] sort of recovery, that they would be waiving a right to pursue liqui-

dated damages under state law, or that they would be precluded from pursuing an action on their own.

3 At that time, we were already 62% of the way through the opt-in period.

Another problem is with the class definitions. The proposed class for the New York Labor Law claim is "all employees of Defendants who did not work in agriculture or secondary agriculture as defined by the FLSA and its implementing regulations." This proposed class definition begs the very legal question at issue in this case - were the workers engaged in agriculture or secondary agriculture within the meaning of the FLSA. The Court does not understand how anyone, let alone these particular proposed class members, can know whether they fall within this class until there has been a legal determination of whether, under the facts and circumstances of this case, the workers packing corn at Gill Corn Farms that was grown at Paul farms, or other farms, were engaged in agriculture [*19] or secondary agriculture. Stated otherwise, the class definition depends upon a legal determination that has not yet been made. Until that legal determination has been made, the Court believes that it would be impossible to manage the class as to the overtimes claims. Thus, that class definition is unworkable.

Recognizing a potential problem with this definition, Plaintiffs have proposed a new class consisting of "all employees of Defendants who packed produce at Gill Corn Farms, Inc. between September 15, 1997 and September 15, 2003." The new, proposed definition is more workable because it is fact-based. However, determining whether any particular class member packed corn grown at Gill Corn Farms or some other farm may prove to be a very individualized, fact-intensive inquiry. The Court need not address this now because there are other reasons warranting a denial of class certification of the New York Labor Law claims and related AWPA payment claims.

First, as discussed, CPLR § 901 presents an obstacle to certification.

Second, Defendants have raised the concern of potential confusion to class members that could be caused by employing conflicting class procedures in the same [*20] case. This is because class actions under the FLSA use an opt-in procedure, while Rule 23 uses an opt-out procedure. This Court agrees with those other courts that have found that "a notice that calls both for a decision to opt-in to a collective action and also whether to opt-out of the class action . . . seems [to be] an inherently difficult task to [do] . . . in a non-confusing manner." De La Fuente v. FPM Ipsen Heat Treating, Inc., 2002 U.S. Dist. LEXIS 24040, 2002 WL 31819226, at *2 (N.D. Ill. 2002); see also McClain v. Leona's Pizzeria, Inc., 222

F.R.D. 574, 577 (N.D. Ill. 2004); Thiebes v. Wal-Mart Stores, Inc., 2002 U.S. Dist. LEXIS 664, 2002 WL 479840, at *2 (D. Or. 2002). This Court has serious concerns whether class actions in general adequately protect the rights of potential class members. It has even more concern in a situation where potential class members have to pick and choose whether to opt-in to a federal overtime wage claim and opt-out of a state overtime wage claim. This confusion is exacerbated by the problems caused by the different statute of limitations applicable to FLSA and New York Labor Law claims and N.Y.C.P.L.R. § 901(b), which would require persons [*21] opting out of the state law class action to waive liquidated damages available under the Labor Law. In short, the potential class members, who are comprised of migrant farm workers, many of whom may not speak English and likely have very little understanding of our legal system, would be forced to make the confusing choices of opting into an FLSA overtime action and then deciding whether it should opt out of a New York overtime action, taking into consideration issues concerning the statute of limitations and the requirement that they waive their right to liquidated damages if they do not opt out of the New York claim. The potential for error is too high.

Third, Congress specifically decided to use an opt-in scheme for overtime claims. "That policy and the underlying congressional intent would be thwarted if a plaintiff were permitted to back door the shoehorning in of unnamed parties through the vehicle of calling upon similar state statutes that lack such an opt-in requirement." Rodriguez v. The Texan, Inc., 2001 U.S. Dist. LEXIS 24652, 2001 WL 1829490, at *1 (N.D. Ill. Mar. 7, 2001); see also McClain v. Leona's Pizzeria, Inc., 222 F.R.D. 574, 577 (N.D. Ill. 2004). In discussing [*22] whether a district court should exercise supplemental jurisdiction over state law wage claims in an action brought under the FLSA, the Third Circuit stated in De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 310 (3d Cir. 2003), that one "interest in relegating the [state law] claims . . . to state court is Congress' express preference for opt-in actions for the federal cause of action. . . . For policy reasons . . . Congress chose to limit the scope of representative actions for overtime pay . . . violations."

A fourth reason for denying certification is based on the numbers. Remember, the FLSA calls for an opt-in procedure. This opt-in procedure, requiring affirmative action to become a class member, is likely to produce fewer class members than an opt-out procedure whereby one becomes a member by doing nothing. This is particularly true under the circumstances of this case where many, if not most, of the potential class, which consists of migrant farm workers, are dispersed throughout the country in unknown locations and, in the Court's opinion,

are unlikely to get actual notice of the class action. [4] In addition, the FLSA claim covers a two to three year period, [*23] thereby limiting the number of potential members.

> 4 As previously noted, as of November 8, 2004, there are no members in the FLSA class other than the named Plaintiffs because there have been no responses to the opt-in notice. Moreover, by Decision & Order dated December 21, 2004, this action was dismissed as to Plaintiff Vega because her attorneys have been unable to locate her and she has otherwise failed to participate in the prosecution of this matter. This strongly suggests that potential class members will not actually receive notice of a class action.

The New York Labor Law claim, on the other hand, would employ an opt-out procedure that would necessarily include much larger numbers than the FLSA claim. Furthermore, the New York claim covers a six year period, thereby vastly expanding the number of qualified class members over the federal claim. Thus, the New York claim likely will involve substantially more class members than the federal claim. As the Third Circuit noted in De Asencio, "the disparity [*24] in numbers of similarly situated plaintiffs may be so great that it becomes dispositive by transforming the action to a substantial degree, by causing the federal tail represented by a comparatively small number of plaintiffs to wag what is in substance a state dog." 342 F.3d at 311; see also Harper v. Yale Int'l Ins. Agency, Inc, 2004 U.S. Dist. LEXIS 8476, 2004 WL 1080193 (N.D. Ill. 2004); Muecke v. A-Reliable Auto Parts and Wreckers, Inc., 2002 U.S. Dist. LEXIS 11917, 2002 WL 1359411, at *2 (N.D. Ill. 2002). Although the legal analysis is essentially identical under the FLSA and New York's Labor Law, thereby distinguishing this case, in part, from De Asencio, the sheer numbers involved would cause this case to become predominated by state claims. [5] Thus, taking into consideration whether a class action is a superior method under the facts and circumstances presented and whether the Court should exercise supplemental jurisdiction where the state claim substantially predominates over the federal claim or for other compelling reasons, see 28 U.S.C. § 1367(c)(2) and (c)(3), the Court declines to certify the state law claim. Even if certification was proper (under [*25] either 23(b)(2) or 23(b)(3)), the Court would decline to exercise supplemental jurisdiction over a state Labor Law class claim.

> 5 Again, this is particularly so in this case where, as of November 8, 2004, there are no members of the FLSA class (except two of the three named Plaintiffs).

2005 U.S. Dist. LEXIS 44675, *

Fifth, taking into consideration the doctrine of collateral estoppel, the Court is not convinced that a class action is the superior means of litigating the issues presented. J.M. Woodhull, Inc. v. Addressograph-Multigraph, Corp., 62 F.R.D. 58, 61 (S.D. Oh. 1974); 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1779 (2d ed. 1986). If the current Plaintiffs litigate the underlying legal issue concerning: (1) whether they are exempt from overtime under the FLSA; (2) whether the housing conditions were inadequate; and (3) whether they received proper pay and notice under the AWPA, it would seem that Defendants would be collaterally estopped from challenging those determinations in subsequent [*26] litigation. The only remaining issue would be that of damages, a particularly individualized inquiry that would also remain outstanding even if these claims proceeded as a class action. To recover with respect to the pay claims, each plaintiff, or class member, would be required to prove that they performed non-exempt work and when they performed non-exempt work. To recover on the housing and notice claims, each plaintiff or class member would be required to prove that they resided in the housing, when, for how long, and under what conditions. This would require separate trials for each plaintiff on the issue of damages. [6]

> 6   For reasons previously discussed, such damages trials are unlikely to ever materialize because of the low probability that class members would receive notice of the pending litigation.

Sixth, and somewhat related to the previous point, the Court sees little value in undertaking the efforts and expense [7] of a class action until the legal issue of whether the plaintiffs were performing overtime [*27] exempt work has been resolved and the potential class can be identified with more certainty. There appears to be one significant issue here that will affect all the overtime claims. That is whether the packing work at issue falls within an overtime exemption. Defendants have already stated their intention to seek a resolution of this issue on a motion for summary judgment and the Court believes that this would be the most appropriate and cost-effective way of furthering this litigation. At this juncture, a class action simply is not a superior method for a fair and efficient adjudication of the controversy. As noted, once this liability issue is resolved, the matter turns to individualized inquiries of damages.

> 7   On the issue of expense, Plaintiffs' counsel indicated that they would take out television, radio, and newspaper ads in an attempt to inform the potential class members of the class action. Ads would have to be in English and Spanish. Plaintiffs' counsel also discussed retaining services

from a firm in Mexico to give notice to individuals residing their. In light of the fact that the class members are dispersed throughout the United States and Mexico, it appears that the cost of providing adequate notice to potential class members would be exorbitant. High class administration costs often have the effect of lowering the amount of damages available to class members, another potential reason why a class action is not the most fair and efficient manner of adjudicating the instant controversy.

[*28]   The Court would be inclined to allow certification as to the AWPA payment-related claim, except for four concerns. The first is that the proposed class definition under the AWPA of "all migrant or seasonal farm workers who were employed by Defendants between 1997 and the present" is too broad because it could encompass persons who were not packing corn grown at another farm. The second problem is that the definition is too broad because "the present" continually changes from second to second. Plaintiffs will need to put more certainty to the class definition, particularly in light of the prior finding that certification is not appropriate under Rule 23(b)(2). The third problem is that this claim also hinges upon the legal determination of whether the workers were engaged in agriculture or secondary agriculture. If no overtime was due, then no payment or notice claims will lie under the AWPA. There is little point to go through the work of sending out notices and otherwise managing a class until the underlying legal issue has been resolved. The fourth concern incorporates all of the concerns previously discussed with respect to the overtime claims.

The Court finds that many of the [*29] management concerns previously discussed are less significant with respect to the housing-related and AWPA notice claims and that the class definitions are appropriate and, thus, those classes may be certified. Although there are still some issues concerning the conflicting opt-in and opt-out procedures, the Court finds that the potential for confusion is somewhat lessened where two distinct causes of action are at issue. Thus, we are left with a potential federal overtime claim, which is opt-in, and a federal and state housing claim, which is opt-out. The Court believes that, with clearly worded notices, the potential class members might be able to distinguish between these two types of claims, as opposed to distinguishing between federal and state overtime claims. The Court does have continuing concern over providing notice to the potential class members. Thus, the Court declines to certify the class absent adequate assurances from Plaintiffs that the proposed class members are reasonably likely to get notice of a class action. The Court also notes that, if Plaintiffs intend to pursue the state wage claim in state court,

in the interest of economy, it may make more practical sense [*30] for the housing-related claims to be asserted along with state wage claim.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is DENIED.

IT IS SO ORDERED.

Dated: January 25, 2005

Thomas J. McAvoy

Senior, U.S. District Judge

LEXSEE



Caution
As of: Feb 17, 2012

## SAUL DELEON v. TIME WARNER CABLE LLC; TIME WARNER CABLE, INC.; TIME WARNER CABLE SERVICES LLC; and TIME WARNER CABLE SHARED SERVICES

### CV 09-2438 AG (RNBx)

### UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

### 2009 U.S. Dist. LEXIS 74345

### July 17, 2009, Decided
### July 17, 2009, Filed

**SUBSEQUENT HISTORY:** Motion denied by Deleon v. Time Warner Cable LLC, 2010 U.S. Dist. LEXIS 22077 (C.D. Cal., Feb. 22, 2010)

**CORE TERMS:** class members, rest period, meal, causes of action, premiums, unpaid, time period, leave to amend, setting forth, factual allegations', statutory language, heightened, conclusory, antitrust, failure to pay, reasonable inferences, work performed, civil actions, threadbare, compensate, quotation, willfully, purported, immunity, recitals, applicability, preferably, red-lined

**COUNSEL:** [*1] Attorneys for Plaintiffs: Not Present.

Attorneys for Defendants: Not Present.

**JUDGES:** Honorable ANDREW J. GUILFORD.

**OPINION BY:** ANDREW J. GUILFORD

## OPINION

### CIVIL MINUTES - GENERAL

**Proceedings: [IN CHAMBERS] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

The Supreme Court's recent decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), has garnered a lot of attention. It has been called "a new touchstone" and "the case that will be cited more than

any other by a factor of 100." Kristina Peterson, *Business Capitalizes on Ruling in Political Case,* WALL ST. J., June 27, 2009, at A2. Indeed, the issues addressed by the *Iqbal* Court are determinative in this Court's ruling on the motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (the "Motion"), filed by defendants Time Warner Cable LLC, *et al.* ("Defendants").

The Court finds this matter appropriate for decision without oral argument. FED. R. CIV. P. 78. Accordingly, the Court VACATES the hearing on this matter scheduled for July 20, 2009. The First Amended Complaint ("FAC") filed by plaintiff Saul Deleon ("Plaintiff") does not withstand the scrutiny mandated by *Iqbal*. Accordingly, the Court GRANTS the Motion.

The Court grants the Motion with leave to amend. Plaintiff [*2] may file an amended complaint within 10 days of this Order, setting forth adequate allegations against Defendants. The amended complaint shall be complete in and of itself, and shall not incorporate by reference any prior pleading. The amended complaint should reflect any changes, preferably in a red-lined copy.

### ANALYSIS

Plaintiff worked for Defendants as a Customer Account Representative. (FAC P 18.) Plaintiff sued Defendants, seeking to allege the claims numbered as follows: (1) failure to pay overtime in violation of California Labor Code §§ 510 and 1198; (2) unpaid meal break premiums in violation of California Labor Code §§ 226.7

Page 1

and 512(a); (3) unpaid rest period premiums in violation of California Labor Code § 226.7; (4) wages not timely paid upon termination, in violation of California Labor Code §§ 201 and 202; (5) wages not timely paid during employment, in violation of California Labor Code § 204; (6) failure to pay vacation wages, in violation of California Labor Code § 227.3; and (7) violation of Cal. Bus. & Prof. Code § 17200, et seq.

The parties disagree about whether *Iqbal* applies to this case, so the Court must first determine the applicability of *Iqbal*.

### 1. APPLICABILITY [*3] OF *IQBAL*

Plaintiff argues that this Court should not apply the "heightened standard" set forth in *Iqbal*. ("Plaintiff Saul Deleon's Opposition to Defendant Time Warner Cable, LLC'S Motion to Dismiss Pursuant to FED. R. CIV. P. 12(b)(6)" ("Opp'n") 6:26-27.) Plaintiff argues that *Iqbal* does not apply because *Iqbal* "deals with sufficient factual pleading when a plaintiff is asserting allegations against a defendant with implied governmental immunity." (*Id.* 5:11-17.) Further, Plaintiff asserts that "[u]nlike *Iqbal*, here there is no 'state of mind' element to any of Plaintiff's alleged wage and hour causes of action and no risk of abusing the litigation process regarding government officials." (*Id.* 6:22-25.)

The Court disagrees. Plaintiff's arguments contradict the explicit language of the *Iqbal* majority, which said:

> Respondent first says that our decision in *Twombly* should be limited to pleadings made in the context of an antitrust dispute. This argument is not supported by *Twombly* and is incompatible with the Federal Rules of Civil Procedure. Though *Twombly* determined the sufficiency of a complaint sounding in antitrust, the decision was based on our interpretation and application of Rule 8. [*4] That Rule in turn *governs the pleading standard in all civil actions and proceedings in the United States district courts.*

*Iqbal*, 129 S. Ct. at 1953 (emphasis added; internal citation and quotation omitted). The Supreme Court concluded that its decision in *Twombly*, and by extension its decision in *Iqbal*, "expounded the pleading standard for all civil actions." *Id.* (internal quotation omitted). What Plaintiff calls a "heightened standard" is not a heightened standard at all. Instead, it is a fundamental statement of the standard that courts should apply when performing Rule 8 analyses. The *Iqbal* standard should not, as Plain-

tiff argues, be restricted to cases involving governmental immunity and antitrust. It applies to all civil cases.

With this in mind, the Court will now analyze the merits of the Motion.

### 2. 12(b)(6) MOTION

The FAC fails to state a claim upon which relief can be granted. Thus, the Court must dismiss it. FED. R. CIV. P. 12(b)(6).

A complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "'[D]etailed factual allegations' are not required." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (May 18, 2009) [*5] (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 554, 555 (2007)). A court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993).

But the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). A court should not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," *Iqbal*, 129 S. Ct. at 1940, or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies of [*6] the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

Here, the FAC amounts to the "threadbare recitals of a cause of action's elements, supported by mere conclusory statements" that the *Iqbal* Court warned against. Plaintiff argues that the FAC contains "numerous paragraphs" that "are sufficient to allege the enumerated causes of action." (Mot. 4:12-13.) To support this argument, Plaintiff offers the following list of allegations:

> P 33 -- "During the relevant time period, Plaintiff and class members consistently worked in excess of eight (8) hours in a day, in excess of twelve (12) hours in a day, and/or in excess of forty (40) hours in a week."

P 46 -- "During the relevant time period, Defendants willfully required Plaintiff and class members to work during meal periods and failed to compensate Plaintiff and class members for work performed during meal periods."

P 55 -- "During the relevant time period, Defendants willfully required Plaintiff and class members to work during rest periods and failed to compensate Plaintiff and class members for work performed during rest periods."

(FAC 4:14-23.)

Plaintiff argues that these passages allege [*7] sufficient facts to satisfy Rule 12(b)(6). The Court disagrees.

It is true that class actions can require somewhat more generalized pleadings. But the FAC should allege more specific facts about Plaintiff himself, if not about the entire class. *See, e.g., In re Tobacco II Cases,* 46 Cal. 4th 298, 306, 93 Cal. Rptr. 3d 559, 207 P.3d 20 (Cal. 2009) (finding in the context of a UCL claim that standing requirements should be relaxed as to class members but not as to the purported lead plaintiff). Instead, the FAC regularly recites the statutory language setting forth the elements of the claim, and then slavishly repeats the statutory language as the purported factual allegations.

For example, Plaintiff's second claim is for unpaid meal break premiums in violation of California Labor Code §§ 226.7 and 512(a). In this claim, Plaintiff alleges that "California Labor Code section 226.7 provides that no employer shall require an employee to work during any meal period . . . .," and that Defendants "required Plaintiff and class members to work during meal periods . . . ." (FAC PP 39, 46.) Similarly, Plaintiff's third claim is for unpaid rest period premiums in violation of California Labor Code § 226.7. In this claim, Plaintiff [*8] alleges that "California Labor Code section 226.7 provides that no employer shall require an employee to work during any rest period . . . .," and that Defendants "required Plaintiff and class members to work during rest periods . . . ." (*Id.* PP 52, 53.) In these and Plaintiff's other claims, Plaintiff simply parrots the statutory language. *Iqbal,* 129 S. Ct. at 1940.

If Plaintiff wishes to survive a motion to dismiss, Plaintiff must plead sufficient "factual content" to allow the Court to make a reasonable inference that Defendants are liable for the claims alleged by Plaintiff. *Iqbal,* 129 S. Ct. at 1940 (citing *Twombly,* 550 U.S. at 556). In the FAC, Plaintiff has not pled sufficient factual content.

## DISPOSITION

The Court GRANTS the Motion with leave to amend. Plaintiff may file an amended complaint within 21 days of this Order, setting forth adequate allegations against Defendants. The amended complaint shall be complete in and of itself, and shall not incorporate by reference any prior pleading. The amended complaint should reflect any changes, preferably in a red-lined copy.

LEXSEE



Cited
As of: Feb 17, 2012

**Brenda A. Sells-Lawrence, Plaintiff, v. Chase Manhattan Bank, N.A. and Chase Agency Services, Inc., Defendants.**

**Civ. No. 1999-133**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE VIRGIN ISLANDS, DIVISION OF ST. THOMAS AND ST. JOHN**

**2002 U.S. Dist. LEXIS 4346**

**March 12, 2002, Decided**

**NOTICE:**  [*1] NOT FOR PUBLICATION

**DISPOSITION:**  Plaintiff's motion to reconsider GRANTED; Defendants' supplemental motion for summary judgment GRANTED; Court's order of September 28, 2000 reaffirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee moved for reconsideration and clarification of the court's order which granted defendant employer's motion to dismiss the employee's claim under the Virgin Islands Wrongful Discharge Act (WDA), 24 V.I. Code Ann. § 76, and for summary judgment of her state law claims. The employer filed a supplemented motion for summary judgment.

**OVERVIEW:** The employee alleged wrongful termination under the WDA after her employment was terminated upon the employer's discovery that she had entered into a pre-trial diversion program stemming from a credit card theft charge. The court granted the employer's motion to dismiss the employee's WDA claim on the ground that the National Labor Relations Act, 29 U.S.C.S. §§ 151-166, preempted the WDA and granted its motion for summary judgment on the employee's state law. The employee sought reconsideration, which was granted, but the employer filed a supplemental motion for summary judgment claiming that the employee's WDA claim was preempted by 12 U.S.C.S. § 1829 of the Federal Deposit Insurance Act, 12 U.S.C.S. §§ 1811-1835a. The court

granted the motion for summary judgment and affirmed its prior dismissal of the action because the employer, an insured bank, was clearly prohibited from allowing any individual who had entered into a pretrial diversion program, because of a charge involving dishonesty, to work or continue to work at the bank. Even where the employee had a good faith believe that her record had been expunged when it had not been expunged, § 1829 preempted the WDA.

**OUTCOME:** Plaintiff's motion to reconsider was granted. Defendants' supplemental motion for summary judgment was granted. Court's dismissal of plaintiff's Wrongful Discharge Act claim was reaffirmed.

**CORE TERMS:** summary judgment, preempt, federal law, supplemental, state law, diversion program, reconsider, preempted, pretrial, wrongful discharge, insured, Organic Act, background check, depository institution, territorial, terminated, preemption, dishonesty, pre-trial, expunged, employment application, breach of contract, diversity jurisdiction, criminal offense, self-defamation, defamation, completion, diversion, convicted, frustrate

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Discovery Materials*

[HN1]Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue respecting any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Constitutional Law > Supremacy Clause > Federal Preemption*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption*
[HN2]It is well-established that there are three instances where federal law preempts state law. First, when a federal statute explicitly displaces state law, state law is said to be expressly preempted. U.S. Const. art. VI, cl. 2. Second, federal law will preempt state law when federal law so thoroughly occupies a legislative field as to make reasonable the inference the Congress left no room for the States to supplement it. Finally, federal law preempts state law when a state law makes it impossible to comply with both state and federal law or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Banking Law > Federal Deposit Insurance Corporation > Enforcement Powers*
[HN3]See 12 U.S.C.S. § 1829.

*Banking Law > Federal Deposit Insurance Corporation > Enforcement Powers*
[HN4] 12 U.S.C.S. § 1829(a)(1)(B) declares that a bank may not permit an individual prohibited from working pursuant to 12 U.S.C.S. § 1829(a)(1)(A) to engage in any conduct or continue any relationship with the bank.

**COUNSEL:** Pedro K. Williams, Esq., St. Thomas, U.S.V.I., For plaintiff.

Charles E. Engeman, Esq., David J. Comeaux, Esq., St. Thomas, U.S.V.I., For defendants.

**JUDGES:** Thomas K. Moore, District Judge.

**OPINION BY:** Thomas K. Moore

**OPINION**

**MEMORANDUM**

Moore, J.

Plaintiff Brenda Sells-Lawrence ["Sells-Lawrence" or "plaintiff"] has moved to reconsider and clarify this

Court's order of September 28, 2000, granting defendant Chase Manhattan Bank, N.A. and Chase Agency Services, Inc.'s [collectively "Chase"] motion to dismiss and for summary judgment. Chase concedes that this Court must reconsider the September 28th order in regard to the Virgin Islands Wrongful Discharge Act ["WDA"], but has supplemented its motion for summary judgment, which plaintiff opposes. For the reasons stated below, this Court will grant plaintiff's motion to reconsider and grant [*2] Chase's supplemental motion for summary judgment.

**I. Factual and Procedural Background**

On December 17, 1996, plaintiff began working for Chase as an Assistant Treasurer/Agent Assistant. Following a background check, Chase discovered that Sells-Lawrence had entered into a pre-trial diversion program in 1992 stemming from a credit card theft charge in Crawford County, Pennsylvania. Upon learning of plaintiff's entry into the pre-trial diversion program on April 22, 1997, Chase immediately terminated plaintiff's employment. Sells-Lawrence subsequently filed suit against Chase in the Territorial Court, alleging claims of wrongful termination under the Virgin Islands Wrongful Discharge Act, 24 V.I.C. § 76, breach of contract, defamation and self-defamation. Chase then successfully removed the case to this Court on the ground of diversity jurisdiction. After a hearing in this Court on February 18, 2000, I granted Chase's motion to dismiss plaintiff's claim under the WDA on the ground that the National Labor Relations Act ["NLRA"], 29 U.S.C. §§ 151-166, preempted the WDA and granted its motion for summary judgment on plaintiff's claims of defamation, self-defamation [*3] and breach of contract.

On October 4, 2000, plaintiff filed a motion to reconsider and clarify the Court's ruling on her WDA claim in light of the Third Circuit Court of Appeals' ruling in *St. Thomas-St. John Hotel & Tourism Ass'n v. Government of the Virgin Islands, 218 F.3d 232 (3d Cir. 2000)* that the NLRA did not preempt the WDA. [1] Although Chase concedes that the Court must reconsider its ruling on plaintiff's WDA claim, [2] it filed a supplemental motion for summary judgment on June 1, 2001, wherein it argued that plaintiff's WDA claim is preempted by federal banking law, namely 12 U.S.C. § 1829. This Court has diversity jurisdiction under section 22(a) of the Revised Organic Act of 1954 [3] and 28 U.S.C. § 1332.

> 1   Plaintiff's motion for reconsideration only addresses the Court's ruling on her WDA claim. Plaintiff does not provide any basis upon which I can consider her non-WDA claims.
> 2   As it is now clear that the WDA is not preempted by the NLRA, *see St. Thomas-St. John*

*Hotel & Tourism Ass'n v. Government of the Virgin Islands,* 218 F.3d 232, 245 (3d Cir. 2000), there is no need to delve into a lengthy discussion on the merits of plaintiff's motion to reconsider. Suffice to say, that the Court will grant her motion and vacate this Court's February 28, 2000, ruling on the WDA claim.

[*4]

3   48 U.S.C. § 1612(a). The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995 & Supp.2001), *reprinted in* V.I. CODE ANN. 73-177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp.2001) (preceding V.I. CODE ANN. tit. 1).

## II. DISCUSSION

### A. Summary Judgment Standard

[HN1]Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue respecting any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Sharpe v. West Indian Co.,* 118 F. Supp. 2d 646, 648 (D.V.I. 2000). Since the defendants' motion presents only the legal question of whether federal law preempts territorial law, this matter is ripe for summary judgment. *See Spink v. General Accident Ins. Co.,* 40 V.I. 396, 36 F. Supp. 2d 689, 692 (D.V.I. 1999).

### B. Plaintiff's WDA Claim is Preempted by 12 U.S.C. § 1829 [*5]

Chase argues that 12 U.S.C. § 1829(a)(1)(A)(iii) preempts plaintiff's WDA claim because Chase, as a federally insured depository institution, was mandated under federal law to terminate Sells-Lawrence upon the discovery that she had entered into a pretrial diversion program. [HN2]It is well-established that there are three instances where federal law preempts state law. *See St. Thomas-St. John Hotel & Tourism Ass'n,* 218 F.3d at 238 (listing the three methods of preemption). First, when a federal statute explicitly displaces state law, state law is said to be expressly preempted. *See* U.S. CONST. art. VI, cl. 2.; *see also Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 119 L. Ed. 2d 157, 112 S. Ct. 2031 (1992). Second, federal law will preempt state law when federal law "so thoroughly occupies a legislative field as to make reasonable the inference the Congress left no room for the States to supplement it." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 120 L. Ed. 2d 407, 112 S. Ct. 2608 (1992) (defining field preemption). Finally, federal law preempts state law "when a state law makes it impossible [*6] to comply with both federal and state law or when the state law 'stands as an obstacle to the ac-

complishment and execution of the full purposes and objectives of Congress.'" *See St. Thomas-St. John Hotel & Tourism Ass'n,* 218 F.3d at 238 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 85 L. Ed. 581, 61 S. Ct. 399 (1941) (describing conflict preemption)). Therefore, this Court must look to the relevant statute to determine whether federal law preempts the application of the Virgin Islands Wrongful Discharge Act to plaintiff's case.

[HN3]Section 1829 of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835a, states:

> Except with the prior written consent of the [Federal Deposit Insurance Corporation] . . . any person who has been convicted of any criminal offense involving dishonesty or a breach of trust or money laundering, or *has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such offense,* may not . . . otherwise participate, directly or indirectly, in the conduct of the affairs of any insured depository institution; and . . . any insured depository institution [*7] *may not permit any person referred to [above] to engage in any conduct or continue* any relationship prohibited under such subparagraph.

12 U.S.C. § 1829(a)(1)(A)(iii), (a)(1)(B)(emphasis added). Although Congress did not expressly state that section 1829 preempts the WDA, Congress clearly and unambiguously has prohibited an insured bank, such as Chase, from allowing any individual who has entered into a pretrial diversion program because of a charge involving dishonesty to work or continue to work at that bank. In short, it would frustrate Congressional intent to allow the plaintiff to use a territorial statute to obtain reinstatement to her job where section 1829 specifically has precluded such employment. Therefore, as it is impossible for Chase to comply with both section 1829 and the WDA, section 1829 takes precedence.

Sells-Lawrence advances two arguments to defeat Chase's motion for summary judgment. First, she argues that she did not intend to deceive or mislead Chase when she filled out her employment application because she had a good faith belief that her record was expunged due to her completion of the pretrial diversion program. (Mem. [*8] of Law in Supp. of Pl's Opp. to Def.'s Supplemental Mot. for Summ. J. at 3-5.) Plaintiff's good faith belief, however, is irrelevant to the matter at hand. When plaintiff filled out her application, her record had not been expunged; it was not expunged until June 11, 1997, approximately two months after Chase discharged

her. (Def.'s Mem. in Supp. of Supplemental Mot. for Summ. J., Ex. 4.) Since plaintiff's record still showed she had entered into a pretrial diversion program, federal law prohibited Chase from continuing her employment. [4]

> 4   According to defendant, Chase offered to reinstate plaintiff effective on the date of June 11th expungement, but plaintiff refused the offer and instead pursued her lawsuit. (Def.'s Reply in Supp. of Supplemental Mot. for Summ. J. at 4 n.3.)

In plaintiff's second argument, Sells-Lawrence makes the circular contention that Chase cannot use section 1829 to justify its action since it also violated the section by allowing her to work at the bank. This argument is also without [*9] merit. First of all, Chase did not knowingly employ an individual prohibited under section 1829 from working at a bank. Plaintiff marked "No" on her employment application when asked whether she had "ever been convicted of, pleaded guilty or, no contest to, entered into a pre-trial diversion or similar program concerning any criminal offense . . . including, but not limited to, crimes of dishonesty . . . ." (Def.'s Mem. in Supp. of Supplemental Mot. for Summ. J., Ex. 2.) Chase did not find out that plaintiff had in fact entered into a pretrial diversion program until after her background check, at which point it lawfully terminated her employ as mandated by section 1829. Secondly, the language of section 1829 contemplates that a bank may allow a person to start work before the completion of the background check. [HN4]Section 1829(a)(1)(B) declares that a bank may not permit an individual prohibited from working pursuant to section 1829(a)(1)(A) "to engage in any conduct or *continue any relationship*" with the bank. This subsection covers a situation where the bank discovers, after hiring a person, that she has violated section 1829 and requires that the bank discharge this person. Such [*10] is the case here. Upon learning of plaintiff's violation, Chase terminated her employment in compliance with section 1829. Therefore, as Sells-Lawerence fails to establish any reason why section 1829 should not preempt her WDA claim, this Court will grant Chase's supplemental motion for summary judgment.

## III. CONCLUSION

Section 1829 of the Federal Deposit Insurance Act preempts the WDA because compliance with both statutes would frustrate the purpose and objective of Congress in enacting section 1829. Therefore, this Court will reaffirm its order of September 28, 2000, dismissing plaintiff's WDA claim, but on the different ground that it is preempted by 12 U.S.C. § 1829(a)(1)(A)(iii).

**ENTERED this 12th day of March, 2002.**

**For the Court**

   /s/

**Thomas K. Moore**

**District Judge**

## ORDER

For the reasons set forth in the foregoing Memorandum of even date, it is hereby

**ORDERED** that plaintiff's motion to reconsider the wrongful discharge portion of this Court's order of September 28, 2000 (Docket No. 16) is **GRANTED**; and it is further

**ORDERED** that defendants' supplemental motion for summary judgment (Docket No. 26) is **GRANTED** [*11] and this Court's order of September 28, 2000, dismissing plaintiff's Wrongful Discharge Act claim is reaffirmed.

**ENTERED this 12th day of March, 2002.**

**For the Court**

   /s/

**Thomas K. Moore**

   **District Judge**

LEXSEE



Cited
As of: Feb 17, 2012

**THE MAZZA CONSULTING GROUP, INC, Plaintiff, - against - CANAM STEEL CORPORATION and EASTERN BRIDGE, LLC, Defendants.**

**08-CV-38 (NGG)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2008 U.S. Dist. LEXIS 32670**

**April 21, 2008, Decided**
**April 21, 2008, Filed**

**CORE TERMS:** completion, arbitration, arbitration clause, steel, delivery, arbitrate, compel arbitration, default, non-signatory's, cause of action, arbitration agreement, arbitrability, timing, steel products, deliver, arbitration provision, disputes arising, intertwined, arbitrator, quotation, grievance, binding, arisen, agreed to arbitrate, waived, Federal Arbitration Act FAA, parties agreed, agreement to arbitrate, agreed to submit, subject to arbitration

**COUNSEL:** [*1] For The Mazza Consulting Group, Inc., Plaintiff: Howard B Cohen, LEAD ATTORNEY, The Vincent A. Deiorio Law Firm, Rye Brook, NY.

For Canam Steel Corporation, Defendant: Suzan Arden, Wasserman Grubin & Rogers LLP, New York, NY; William K. Wilburn, Pro Hac Vice, WKWilburn P.C., Bethesda, MD.

**JUDGES:** NICHOLAS G. GARAUFIS, United States District Judge.

**OPINION BY:** NICHOLAS G. GARAUFIS

**OPINION**

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Court Judge.

Defendants Canam Steel Corporation ("Canam") and Eastern Bridge, LLC ("Eastern Bridge") (collectively,

"Defendants") have both filed motions to dismiss the Complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, to stay the case and compel Plaintiff Mazza Construction Group, Inc. ("Mazza" or "Plaintiff") to arbitrate its claims. For the reasons that follow, the court dismisses the Complaint without prejudice and compels Mazza to arbitrate its claims pursuant to the terms set forth in the parties' Completion Agreement.

**I. Standard of Review**

**A. Motion to Dismiss**

In reviewing a motion [*2] to dismiss for failure to state a claim brought pursuant to Fed R. Civ. P. 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those allegations in favor of the non-moving party. See Albright v. Oliver, 510 U.S. 266, 268, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994); Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999). In deciding such a motion, the court may take into account documents referenced in the complaint, as well as documents that are in the plaintiff's possession or that the plaintiff knew of and relied upon in filing the suit. See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993). In deciding such a motion, the "issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996) (internal quotations omitted).

Where a plaintiff references written documents in the Complaint, the court may take the documents into consideration in ruling on a Rule 12(b)(6) motion even if they are not attached to the Complaint and made a part thereof under Rule 10(c). Sazerac Co., Inc. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994) [*3] (citing Cortec Indus., Inc. v. Sum Holding L. P., 949 F.2d 42, 47 (2d Cir. 1991); I. Meyer Pincus & Assoc., P.C. v. Oppen-heimer & Co., 936 F.2d 759, 762 (2d Cir. 1991)). If the documents referenced in the complaint contradict the facts alleged by the plaintiff, the documents control and the court need not accept as true the plaintiff's allegations. See Feick v. Fleener, 653 F.2d 69, 75 & n.4 (2d Cir. 1981).

## B. Motion to Compel Arbitration

In evaluating a motion to compel arbitration brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, the court should apply a standard similar to that applicable to a motion for summary judgment. Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). When such a motion is opposed on the ground that no agreement to arbitrate has been made between the parties, a district court should give the opposing party the benefit of all reasonable doubts and inferences that may arise. Doctor's Assocs., Inc., v. Distajo, 944 F. Supp. 1010, 1014 (D. Conn. 1996), aff'd, 107 F.3d 126 (2d Cir. 1997).

## II. Background

Mazza commenced this action by Complaint dated November 1, 2007. (See Complaint ("Compl.") (Docket Entry # 1).) The Complaint alleges that Defendants [*4] breached certain agreements entered into between Mazza and Eastern Bridge concerning a construction project on the Whitestone Expressway. Mazza is a "consortium of experts who assist owners, general contractors, developers, architects and engineers . . . in coordinating and expediting . . . the performance and completion . . . of significant public and private commercial construction projects" in the tri-state area. (Id. P 9.) Eastern Bridge and Canam manufacture, produce, fabricate, and deliver steel and steel-related products for various construction projects. (Id. P 10.)

In the Complaint, Mazza alleges the following facts, which the court assumes to be true for the purposes of this motion to dismiss: (1) On or about January 23, 2003, Eastern Bridge entered into subcontract Purchase Order No. 02-315-23 ("Purchase Order") with general contractor Tully Construction Company/A.J. Pegno Construction Corp. JV ("Tully"), whereby Eastern Bridge was to provide labor and materials for the installation and fabrication of steel at the Whitestone Expressway project in Queens, New York ("Whitestone Project) (id. PP 1, 36); (2) On or about January 30, 2006, Mazza and Eastern

Bridge entered into [*5] an "Engagement Agreement," ("Engagement Agreement") whereby Mazza was retained "to provide its expertise in gathering information and data for the preparation of a payment claim for the Whitestone Project," (id. P 11), and Mazza was also retained under the Engagement Agreement to provide its expertise and guidance in negotiations and collections concerning the Whitestone Project (id. P 11); and (3) On or about May 15, 2007, Mazza, Eastern Bridge, and Tully entered into a Completion Agreement ("Completion Agreement") whereby Mazza was to perform additional services relating to the Whitestone Project (id. P 36).

The Complaint further alleges: (4) that Eastern Bridge agreed to pay Mazza on an hourly basis for work performed by its experts in preparation of the payment claim (id. P 12); (5) that Eastern Bridge agreed that, in addition to its obligations to pay Mazza for certain services on an hourly basis, Eastern Bridge would pay Mazza a ten-percent "success fee of any and all claim items, finally accepted, and paid as they appear in the Mazza report or claim book" (id. P 12); (6) that Mazza provided the agreed-upon work, labor, and services to Eastern Bridge for the Whitestone Project [*6] pursuant to the terms of the January 30, 2006 written agreement, i.e. the Engagement Agreement (id. P 13); and (7) that "[d]espite due demand, Eastern has failed, refused and neglected to pay Mazza the outstanding balance in the January 30, 2006 contract" in the sum of $ 238,588.00 plus statutory interest (id. P 14). Specifically citing the Completion Agreement, Mazza further alleges that Eastern Bridge failed to deliver steel and steel-related products in accordance with agreed-upon delivery dates and, as a result, Mazza will not receive "acceleration payments" of $ 236,000. (Id. PP 37-40.)

Mazza commenced this action based upon its agreements with Eastern Bridge. By separate agreement dated July 16, 2007, Canam purchased certain assets of Eastern Bridge, including the Whitestone Project. Canam is not a signatory to the Engagement or Completion Agreements. (Declaration of Suzan Arden, attorney for Canam ("Arden Decl.") Ex. D.)

The Completion Agreement states in pertinent part:

> 11.) Any disagreement(s) after the date of this agreement, such as but not limited to the production and delivery of steel, delays, defaults, faulting party or the period of extension to be allowed shall be the [*7] subject of binding arbitration conducted under the rules of the American Arbitration Association, at a location in Hartford, CT after the completion of the project. Said disagreement(s) shall not be

a cause to disrupt the delivery of product, or the payments described in the attached Schedule.

12.) No offsets by either party will be allowed under this agreement to interrupt either the payment schedule or the delivery. Any additional charges proposed by either party shall be handled under a separate arrangement so as to prevent any interruption in the work flow or payment stream.

(Completion Agreement; Arden Decl. (emphasis added).) Defendants have submitted motions to dismiss or, in the alternative, to compel arbitration under the terms of the arbitration agreement in the Completion Agreement.

## II. Analysis

### A. Scope of Arbitration Clause

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which suit is pending, upon being satisfied that the issue involved in such suit or proceedings is referable to arbitration  [*8] under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement provided the applicant for the stay is not in default in proceeding with such arbitration.

In three cases that have come to be known as the Steelworkers Trilogy, [1] the Supreme Court has made clear that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960). In Pathmark Stores, Inc. v. United Food & Commercial Workers Local 342-50, this court explained the rule announced in the Steelworkers Trilogy:

The Supreme Court has extracted four principles from the Steelworkers Trilogy that control the issue of arbitrability now before this court. First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." [AT&T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)]. [*9] Second, "the question of arbitrability . . . is undeniably an issue for judicial determination." Id. at 649. Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." Id. at 649. And, fourth, . . . "where the contract contains an arbitration clause, there is a presumption of arbitrability . . . . Such a presumption is particularly applicable where the clause is [ ] broad . . . . In such cases, [i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful of evidence of a purpose to exclude the claim from arbitration can prevail." Id.

204 F. Supp. 2d 500, 503 (E.D.N.Y. 2002) (Garaufis, J.). There is a "two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement." Vera v. Saks & Co., 335 F.3d 109, 117 (2d Cir. 2003) (internal quotations omitted).

1   United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960); United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960);  [*10] United Steelworkers of Am. v. Am. Mfg., 363 U.S. 564, 80 S. Ct. 1343, 4 L. Ed. 2d 1403 (1960).

Here, there is no doubt that the parties agreed generally to arbitrate disputes arising from the Completion Agreement. The Completion Agreement states in pertinent part that "[a]ny disagreement(s) after the date of this agreement, such as but not limited to the production and delivery of steel, delays, defaults, faulting party or the period of extension to be allowed shall be the subject of binding arbitration conducted under the rules of the American Arbitration Association, at a location in Hart-

ford, CT after the completion of the project. Said dis-agreement(s) shall not be a cause to disrupt the delivery of product, or the payments described in the attached Schedule." (Completion Agreement P 11; Arden Decl. (emphasis added).) Thus the parties clearly agreed to arbitrate disputes related to the Completion Agreement, and the court must next turn its attention to whether the specific disputes at issue come within the scope of the Completion Agreement.

On this point, Plaintiff argues that the first document, the Engagement Agreement, does not require arbitration. Canam responds: "[a]s a matter of textual accuracy, this is true; [*11] the Engagement Agreement itself contains no explicit arbitration provision." (Canam Steel Corporation's Reply Memorandum in Further Support of Its Motion to Dismiss or, Alternatively, Stay and Compel Arbitration at 2.) However, while the Engagement Agreement itself contains no explicit arbitration provision, the Completion Agreement, executed only a few months later, broadly contemplates that any disagreements be subjected to arbitration, even disagreements arising under the Engagement Agreement.

The Second Circuit has differentiated between broad and narrow arbitration clauses. See McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988) (internal citations omitted) (holding that "[i]n construing arbitration clauses, courts have at times distinguished between 'broad' clauses that purport to refer all disputes arising out of a contract to arbitration and 'narrow' clauses that limit arbitration to specific types of disputes."). The Second Circuit has previously found that a broad arbitration clause is "presumptively arbitrable." See Collins & Aikman Prod. Co. v. Building Sys., 58 F.3d 16, 20 (2d Cir. 1995) (finding that "[a]ny claim or controversy [*12] arising out of or relating to th[e] agreement," is broad, and, thus, presumptively arbitrable). The Second Circuit has found that this presumption "is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute." WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997) (internal quotation omitted) (internal citation omitted).

Here, the clause at issue was drafted broadly in a way that shows that the parties clearly intended that all disputes arising from the Engagement Agreement be arbitrated under the arbitration clause in the Completion Agreement. The precise issues raised by Mazza in the Complaint -- which relate to production and delivery of steel, delays, defaults, and defaulting parties -- are specifically contemplated by the arbitration clause in the Completion Agreement. The references to "defaults," "defaulting party," and "delays" in the Completion Agreement illustrate that point. More specifically, the

arbitration clause in the Completion Agreement encompasses "any disagreement(s) . . . such as but not limited to the production or delivery of steel," (Completion Agreement [*13] P 11), disagreements that indeed lie at the heart of Plaintiff's Complaint. For example, Plaintiff's seventh cause of action for breach of contract alleges inter alia that "Eastern failed to deliver the steel and related steel products, in accordance with the agreed[-]upon delivery dates, July 23, 2007, and September 24, 2007. As a direct result of Eastern's conduct, Mazza will not receive the agreed[-]upon acceleration payments which total $ 236,000." (Compl. P 38.) The Completion Agreement is dated May 18, 2007, a number of months before the alleged failure to deliver steel and related steel products, and the Completion Agreement's arbitration clause covers the delivery of steel and related steel products. To cite another example, Plaintiff's eighth cause of action for breach of duty of good faith and fair dealing alleges that "Eastern slowed, ceased, terminated and therefore delayed . . . the production of steel and related steel products in breach of the agreed[-]upon Schedule of Delivery and Payment." (Compl. P 44.) That cause of action specifically alleges that Eastern Bridge commenced production on an unrelated Canadian project "[d]espite the unequivocal terms and conditions [*14] of the Completion Agreement." (Id. P 45.)

As Defendant Eastern Bridge argues:

> At the time of execution of the Completion Agreement, all of the parties intended to expedite a claims resolution procedure by mandating Arbitration. Moreover the timing of said arbitration to await the completion of the project was clearly intended to permit all parties to address all issues related to the project at one time and in one forum. The intent was to have one forum to hear all claims, rather than to litigate each alleged default by any party against the others in a piece-meal manner.

(Memorandum of Law in Support of Motion to Dismiss by Eastern Bridge at 4.) Furthermore, the Completion Agreement contemplates that all claims associated with the Whitestone Project prior to the Completion Agreement (i.e., those arising under the Engagement Agreement) are "fully waived and released." (Completion Agreement P 14 ("The parties agree that all claims of any nature whatsoever which they may have against each other associated with this project which have arisen, or relate to actions or inaction of either party, prior to the date of this agreement are hereby fully waived and released.").) Thus, by signing the   [*15] Completion

Page 4

2008 U.S. Dist. LEXIS 32670, *

Agreement, Mazza waived any claims that predated the Completion Agreement and its arbitration clause. Plaintiff's vague argument that the arbitration clause in the Completion Agreement does not refer to and encompass the Engagement Agreement thus defies common sense.

The court finds that the Completion Agreement, on its face, covers the dispute at issue and clearly supplements the Engagement Agreement, defining and limiting the Engagement Agreement. See Pitta, 806 F.2d at 422-23. As such, the claims raised by Mazza in the Complaint are subject to arbitration.

## B. Applicability of Clause to Consenting Non-Signatory Defendant

Secondly, as to Defendant Canam, the Second Circuit has construed the FAA to require arbitration where, as in the instant case, a consenting non-signatory defendant seeks arbitration. See JLM Industs., Inc. v. Stolt-Nielsen SA, 387 F.3d 163 (2d Cir. 2004) (holding that the defendants, a group of owners whose corporate subsidiaries had signed arbitration agreements, may compel arbitration even though they had not signed the agreements). The Court of Appeals held that:

> Our cases have recognized that under the principles of estoppel, a non-signatory to that agreement [*16] may compel a signatory to that agreement to arbitrate a dispute where a careful review 'of the relationship among the parties, the contracts they signed . . ., and the issues that had arisen' among them discloses that 'the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. . . . [W]here the merits of an issues between the parties was bound up with a contract binding one party and containing an arbitration clause, the 'tight relatedness of the parties, contracts, and controversies' was sufficient to estop the bound party from avoiding arbitration."

Id. at 177 (citations omitted). The determination of whether a non-signatory's issues are intertwined with the arbitration agreement is fact specific, id. at 178, and here the facts are compelling to make such a finding.

First, Mazza's causes of action arise from the Engagement and Completion Agreement and the performance of the Whitestone Project. Thus, "the merits of this dispute are 'bound up with' and linked textually to the terms of the contract that included the arbitration clause. (Defendant Canam Steel Corp's Memo-

randum of Law in Support of Its [*17] Motion to Dismiss or, Alternatively to Stay and Compel Arbitration ("Canam Mem.") at 8.) Second, there is a "tight relatedness of the parties" since Mazza and Eastern Bridge executed the Engagement and Completion Agreements, and Canam acquired Eastern Bridge's contract for the Whitestone Project. (Id.) Finally, Mazza has treated Eastern Bridge and Canam as "a single unit" since Mazza's Complaint alleges that Eastern Bridge and Canam are jointly and severally liable under all nine causes of action. (Id. (citing Compl. PP 1, 15, 19, 23, 25, 28, 34, 40, 46, and 53).)

Based on the relationship among the parties, the contracts they signed, and the issues that have arisen amongst them, Canam has established that the issues it seeks to resolve in arbitration are intertwined with the agreement that Mazza has signed, namely the Completion Agreement. Accordingly, Mazza must arbitrate its claims against Canam in addition to arbitrating its claims against Eastern Bridge.

## C. Timing of Arbitration

Finally, regarding the timing of the arbitration, Defendants argue that the Completion Agreement calls for arbitration to begin "after the completion of the Project." (See Completion Agreement P 11.) They [*18] further argue that this language is unambiguous in requiring that arbitration may occur only after the completion of the Whitestone Project. The Completion Agreement further calls for the arbitration to be "conducted under the rules of the American Arbitration Association," (id.) which permits parties to determine contractually when arbitration may begin. The AAA's Commercial Arbitration and Mediation Procedures provide that "[a]rbitration under an arbitration provision in a contract shall be initiated in the following manner: (I) the initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand")." (Arden Decl., Exh. J, AAA's Commercial Arbitration and Mediation Procedures (Including Procedures for Large, Complex Commercial Disputes), amended and effective September 1, 2007).) The Second Circuit has held that traditional concepts of contract law support the parties' right to determine when arbitration may begin. Mehler v. Terminix Int'l Co. L.P., 205 F.3d 44, 48 (2d Cir. 2000). As the court held in Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 104 (2d Cir. 2006), [*19] "[a]rbitration is entirely a creature of contract. The rules governing arbitration, its location, the law the arbitrators will apply, indeed, even which disputes are subject to arbitration, are determined entirely by an agreement between the parties."

As the parties have agreed to arbitrate this case under the terms of the Completion Agreement, the court defers to the arbitrator to determine the meaning of the arbitration clause's timing provision. If the arbitrator determines that the parties have agreed to arbitrate at the completion of the Whitestone Project, the court sees no reason to order otherwise.

Having made these findings, the court must order that the parties engage in arbitration in accordance with the Completion Agreement. See 9 U.S.C. § 4. Because Mazza and Defendants agreed to arbitration, this court has no jurisdiction to adjudicate any of Mazza's claims against Defendants, and therefore the claims against Defendants are properly dismissed. See, e.g., Olin Corp. v. E.I. Dupont De Nemours and Corp., No. 05-CV-100S (SC), 2006 U.S. Dist. LEXIS 22968, 2006 WL 839415 (W.D.N.Y. March 27, 2006).

### III. Conclusion

For the aforementioned reasons, Defendants' motions to dismiss the Complaint or, in the alternative, [*20] to stay the case and compel Mazza to arbitrate its claims are granted to the extent that the court dismisses the Complaint without prejudice and compels Mazza to arbitrate its claims pursuant to the terms set forth in the parties' Completion Agreement. Plaintiff is hereby granted leave to re-file within thirty days after the arbitration is completed if further relief from this court is necessary. See Valdes v. Swift Transp. Co., Inc., 292 F. Supp. 2d 524, 534 (S.D.N.Y. 2003), Mahant v. Lehman Bros., No. 99 Civ. 4421 (MBM); 2000 U.S. Dist. LEXIS 16966, 2000 WL 1738399, at *3 (S.D.N.Y. November 22, 2000). The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: April 21, 2008

Brooklyn, New York

/s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS

United States District Judge